[L. A. No. 22211. In Bank. Apr. 28, 1952.]

HOUSING AUTHORITY OF THE CITY OF LOS ANGELES, Petitioner, v. CITY OF LOS ANGELES et al., Respondents.

854

Faries & McDowell, McIntyre Faries, Stanley A. Furman, Leonard S. Janofsky, Loeb & Loeb and Herman F. Selvin for Petitioner.

Ray L. Chesebro, City Attorney, William H. Neal, John L. Flynn and Bourke Jones, Assistant City Attorneys, Weldon L. Weber, Deputy City Attorney, Joseph Scott, Frank P. Doherty, Oscar A.Trippett, Kenneth K. Wright and Bodkin, Breslin & Luddy, for Respondents.

SHENK, J.—By this proceeding in mandamus the Housing Authority of the City of Los Angeles seeks to compel the city of Los Angeles to perform specified acts contemplated by the cooperation agreement entered into between them pursuant to the Housing Authorities Law (Health & Saf. Code, § 34200 et seq.), and the Housing Cooperation Law (Health & Saf. Code, § 34500 et seq.), and for such other relief as may be deemed proper. The matter is submitted on an agreed statement of facts.

The controversy arises by reason of certain action taken by the city council on December 26, 1951, whereby it purported to rescind the prior approval of a low-rent housing

project and to abrogate the cooperation agreement entered into in all respects in accordance with law. Subsequently the city refused to perform any of the terms or obligations of the agreement. The facts antecedent to that action are in substance the following:

A resolution adopted by the city council on June 2, 1938, declared the need for a housing authority to function in the city. The Housing Authority of the City of Los Angeles thereby came into being as a body corporate and politic pursuant to the Housing Authorities Law.

On August 8, 1949, Ordinance No. 95,222 was adopted[1] by the unanimous vote of the members of the city council. By the ordinance it was declared that there existed in the city unsafe and insanitary dwelling units greatly in excess of 10,000; and that there were greatly in excess of 10,000 families of low income who were forced to occupy unsafe and insanitary accommodations because private industry had not been able to make available safe and sanitary dwellings at rentals they could afford to pay. The city council thereby approved the development, construction and operation of a low-rent housing project consisting of approximately 10,000 dwelling units, and the application of the housing authority to the Public Housing Administration of the United States for a preliminary loan to make plans and surveys. By the ordinance the city was authorized to enter into the cooperation agreement with the housing authority. The agreement was written into the ordinance and was executed on August 9, 1949. It referred to the 10,000 unit project. It was expressly exclusive of ten prior projects as to which the city had theretofore executed cooperation agreements and which, it is assumed, have been or are being carried out. It expressed approval of applications to the Public Housing Administration of the United States for preliminary loans and for annual contributions on the 10,000 unit project.

On August 10, 1949, the application for reservation of urban low-rent public housing and for the preliminary loan was submitted to the public housing administration of the United States. On August 17, 1949, the application was accepted and a program reservation issued covering 10,000 dwelling units. A preliminary loan contract was entered into between

---

[1] Any question of the due adoption of the ordinance because it was not first submitted to the city planning commission has been settled adversely to the contentions of the plaintiff taxpayers in *Drake* v. *City of Los Angeles*, filed concurrently herewith.

the housing authority and the federal administration on December 2, 1949. The same contracting parties signed annual contributions contracts on October 27, 1950, and November 7, 1950, providing for loans not in excess of $44,694,800 to assist in the development of the project. Advances to the housing authority under these instruments to date aggregate approximately $12,000,000 evidenced by notes outstanding and unpaid.

The housing authority employed architects, engineers, and attorneys; investigated and selected tentative sites, made surveys, and obtained reports from the planning department; submitted reports to the city council which, after reference to the Veterans' Affairs and Housing Committee, were approved; instituted proceedings to acquire the sites and obtained conditional use permits as to some; made contracts for architectural and engineering services under which there has been substantial performance; let a construction contract on one project, and opened bids for construction on another—in connection with all of which the housing authority has expended large sums of money and incurred further substantial obligations. The housing authority collaborated with the various city departments and voluminous exhibits are presented showing cooperative action by the city council including instructions to other city departments to collaborate with the housing authority.

On December 29, 1950, certain taxpayers commenced an action for an injunction to restrain the city and the housing authority from developing, constructing or acquiring the housing project involved until approval had been obtained from a majority of the qualified electors of the city at an election for that purpose, and in conformity with certain requirements of the city charter. (See *Drake* v. *City of Los Angeles, infra,* p. 872 [243 P.2d 525].) In that action, on March 16, 1951, a judgment was rendered for the defendants on their demurrer to the complaint and an appeal was taken by the plaintiffs.

On March 22, 1951, the city council by resolution authorized a contract between the city and the housing authority whereby the city agreed to acquire and to sell and the housing authority agreed to purchase on specified terms tax deeded lands within the project areas. Pursuant to the contract the city acquired 468 of the unredeemed tax deeded lots and parcels. Under the cooperation agreement the city agreed to cooperate with the housing authority by vacating streets, roads, and alleys within the areas necessary in the development

of the project, to accept dedication of land for new streets and to zone or rezone areas as might be necessary in connection with development and construction. .

Between May 28, 1951, and November 1, 1951, the housing authority made various requests to the city to take the necessary action to vacate streets within the areas of the selected sites. In accord with the opinion of the city attorney that the city was legally obligated to take appropriate action, the city council on November 30, 1951, declared by resolution that the streets in such areas be closed. This was the course employed pending the enactment of ordinances. In the case of one area the council adopted an ordinance of intention to vacate streets and fixed a date for hearing, subsequently postponed.

On December 3, 1951, the city council by a margin of one vote adopted a motion that the housing authority be requested to desist from furtherance of the housing program pending a report from the city administrator and the return of Mayor Bowron, and requested advice from the city attorney as to the legal steps to be taken to stop the housing program until it should be submitted to the electors of the city.

On December 11, 1951, a resolution introduced and seconded was referred to the committees of the city council on veterans' affairs and housing and on finance jointly for report. That resolution evidenced a purpose to abandon the undertaking, development and administration of the 10,000 unit housing program; to abrogate and cancel the cooperation agreement of August 9, 1949; to rescind all action taken thereunder and to set aside the council's approvals given as required by the state and federal housing acts. Pending final action thereon the council also issued requests to various officers, boards and departments and to the housing authority to halt furtherance of the project.

On December 18, 1951, the District Court of Appeal, Second District, Division Three, affirmed the judgment for the defendants in *Drake* v. *City of Los Angeles,* *((Cal.App.) 238 P.2d 1062). On December 26, 1951, without receiving the awaited reports the council adopted the pending resolution by a vote of eight to seven. On the same day the petition herein was filed. On January 2, 1952, in a message to the council, the mayor recorded his disapproval of the action.

---

*A hearing was granted by the Supreme Court on February 14, 1952. The final opinion of that court is reported, *post*, 872.

On January 3, 1952, the city council adopted a report of the charter and administrative committee recommending that the city attorney prepare a resolution which would submit to a vote of the people the question whether the 10,000 unit housing program, rescinded by the council, should be reinstated. On January 17, the council adopted a resolution requesting consolidation of a special election to that end with the state primary election on June 3, 1952. The presentation of the resolution to effect the election call and consolidation has been withheld pending the outcome in the present proceeding.

The petition for the writ of mandate and the stipulated facts show that the city has refused to continue performance under the cooperation and the other agreements. Specifically the city has refused to deed to the housing authority the lands acquired for that purpose or to acquire the remaining unredeemed parcels in the area; has refused to continue with the proceedings to vacate and close streets in the area; has refused to withdraw the cessation requests made to the various city departments; and has declined to take any other cooperative action necessary in the development of the project.

The petitioner housing authority takes the position that the city has duties and obligations under the statute and the cooperation agreement and that the court should direct performance. The city on the other hand contends that there is no mandatory duty imposed on it under the statute or the cooperation agreement.

The matter presents to this court the question whether the city had the right to rescind the approval of the projects and to abrogate the cooperation agreement under which it had pursued the obligations thereby assumed for a period of over two years. Counsel for the city rely on the absence of any express provision in the state housing authorities law making performance of the cooperation agreement mandatory, as support for the contention that the law imposes no duty of performance. The contention is also advanced that the city had the power to rescind by virtue of a proviso added in August, 1951, to the Independent Offices Appropriation Act, applicable to the fiscal year ending June 30, 1952. (Public Law 137, 82d Cong., 1st Sess., ch. 376.)

The constitutional validity of the United States Housing Act of 1937 is recognized as settled. (*City of Cleveland* v. *United States,* 323 U.S. 329 [65 S.Ct. 280, 89 L.Ed. 274]; *Housing Authority* v. *Superior Court* (1950), 35 Cal.2d 550,

557 [219 P.2d 457].) No question arises as to the validity of the Housing Authorities Law or of the Cooperation Agreement Law. The constitutionality of those enactments has been determined by prior decisions of this court. (*Housing Authority* v. *Dockweiler* (1939), 14 Cal.2d 437 [94 P.2d 794]; *Kleiber* v. *City & County of San Francisco* (1941), 18 Cal.2d 718 [117 P.2d 657]; *Housing Authority* v. *Superior Court, supra,* 35 Cal.2d 550.)

The declarations of policy and the general provisions contained in the federal and state acts are reviewed extensively in the prior cases which determined the matters of constitutional validity.

The federal slum clearance and low-rent housing act, designed to employ funds and credit of the United States to assist the several states and their political subdivisions in achieving the declared policy, was enacted in 1937. (Sept. 1, 1937, ch. 896, 50 Stats. 888; title 42 U.S.C.A. § 1401 et seq.) Our state Legislature meeting in extraordinary session in 1938 enacted the Housing Authorities Law (Stats. 1938 Ex. Sess. p. 9, as amended; now Health & Saf. Code. § 34200 et seq.), and the Housing Cooperation Law (Stats. 1938, Ex. Sess. p. 2, as amended, now Health & Saf. Code, § 34500 et seq.), in order to afford the means for utilizing the benefits available under the United States Housing Act of 1937 by receipt of federal loans for repayment through operation of completed projects. The Legislature found that there was in existence in this state insanitary and unsafe dwelling accommodations in which persons with low income were forced to reside; that the conditions caused increase and spread of disease and crime and were a menace to the health, safety and economic welfare of the state which could not be relieved through the operation of private industry; that the amelioration of such conditions and the use of public funds for the purpose was a governmental function of state concern; and that it was also in the public interest to have the act immediately effective to relieve the then existing unemployment emergency. ■ In the same year through action of the city council, the "Housing Authority of the City of Los Angeles" was organized to function as the creature, however, of the state legislative action. (Section 4 of the act, Health & Saf. Code, § 34240.) The housing authority was thereby created as a state agency, "a public body corporate and politic" and is not an agent of the city in which it functions. ■ Similarly the city under the Housing

Authorities Law is an agency of the state, functioning under state law to fulfill state purposes, and is not acting pursuant to its fundamental law to effect solely municipal objectives. (*Housing Authority* v. *Superior Court, supra,* 35 Cal.2d 550, 558; *Kleiber* v. *City & County of San Francisco, supra.* 18 Cal.2d 718, 724-725.) ▮▮▮ Each functioning body, the city and the housing authority, is a separate body politic vested with specific duties and powers under the Housing Authorities Law and Housing Cooperation Law to effect a state objective. Neither is functioning independently of that state law. In pursuing the state objective each is governed by the state law and neither may exercise powers not vested or recognized by that law. The city and the housing authority function as administrative arms of the state in pursuing the state concern and effecting the legislative objective.

▮▮▮ The city acted within its discretion in determining the local need for the functioning of the housing authority created by the state act. All considerations of wisdom, policy and desirability connected with the functioning of a housing authority in the city of Los Angeles became settled and have been resolved adversely to the adherents of the city's present position by the actions of the state and of the city in declaring the existence of the need. Upon the formation of the housing authority the state law thereupon and thereafter controlled the city and the housing authority and no other law concerning the acquisition, operation or disposition of property is applicable to the authority except as specifically provided. (Health & Saf. Code, § 34320.)

▮▮▮ In enacting the Housing Authorities Law and the Housing Cooperation Law the Legislature did not take from the city all power to act in connection with housing projects under the statute. The city was given discretionary power to determine initially the need for the housing authority to function and to give approval of a proposed project. The city was also vested with discretionary powers to be exercised pursuant to the cooperation agreement which is required under the federal act. (42 U.S.C.A. § 1415(7)(b).) But having taken the initial discretionary action to bring the housing authority into operation and having approved a project and entered into a cooperation agreement, there was nothing left to be done by either contracting party but to perform administratively whatever was necessary to carry the agreement into effect. (*Kleiber* v. *City & County of San Francisco, supra,* 18 Cal.2d 718, 724; *Housing Authority* v.

*Superior Court, supra,* 35 Cal.2d 550, 558.) Thereafter the city may not refuse to cooperate and thereby decline to exercise its power to effect the completion of the project except as may be otherwise specifically provided by the statute under which it is operating.

The chapters dealing with housing authorities and co-operation agreements are now included in division 24 of the Health and Safety Code relating to Community Redevelopment and Housing. Chapter 1 of part 2 contains the Housing Authorities Law (§§ 34200-34368), and chapter 2 of that part contains the Housing Cooperation Law (§§ 34500-34521). In the following discussion of the city's specific powers, reference will be to the sections of the code.

The legislation created a housing authority in the city but it was not organized to transact business until the city council by resolution declared the need for the housing authority to function. (§§ 34240-34243.) Upon proof of the adoption of the resolution so declaring, the housing authority was conclusively deemed to have been established and authorized to transact business and exercise its powers. (§ 34244.) The city had the power to suspend the functioning of the housing authority if after becoming established the housing authority for a period of two years failed to transact any business or exercise any of its powers, and might reestablish it upon subsequent declaration of necessity. (§ 34245.) The mayor or the city council has the power to appoint the commissioners of the housing authority, who serve without compensation but are entitled to reimbursement for expenses. (§ 34270 et seq.) The appointing power may remove a commissioner for inefficiency, neglect of duty, or misconduct in office. (§ 34282.) Section 34326 declares that all housing projects are subject to the planning, zoning, sanitary, and building laws, ordinances, and regulations applicable to the locality in which they are situated; and that in the planning and location of the project the authority shall take into consideration the relationship to any larger plan or long-range program for the development of the area in which it functions.

Under section 34509 the city is also granted specified powers, such as to dedicate, sell, convey or lease any of its property to the housing authority or to the federal government (§ 34510); to furnish parks, playgrounds, recreational, community, educational, water, sewer, drainage facilities or other works (§ 34511); to furnish, dedicate, close, pave, install, grade, regrade, plan or replan streets, roads, roadways, alleys,

sidewalks or other places (§ 34512); to plan or replan, zone or rezone any part of the area, and make exceptions to building regulations and ordinances to that end (§ 34513); also to change its maps (§ 34514). The city may do all things necessary or convenient to aid and cooperate in the planning, undertaking, construction or operation of housing projects (§ 34516) and incur expenses thereof (§ 34518). It may enter into agreements with the housing authority or the federal government respecting the action so to be taken without any limitation on the duration of such agreements (§ 34515); also agreements with respect to the amounts the housing authority will pay for improvements, services and facilities to be furnished by the city for the benefit of the project (§ 34519). The exercise of the powers thus granted is authorized to be by resolution (§ 34521).

The housing authority is given powers and duties which avowedly are bestowed and imposed for the purpose of carrying to completion the housing projects initiated under the act. (See §§ 34310, 34311, 34312.) Until 1945 the city was not called upon to voice approval or disapproval of a proposed project. In that year (Stats. 1945, p. 1450, as amended 1951, pp. 1922, 1953; Health & Saf. Code, § 34313), in order to give the city an opportunity to reappraise the existing need, the Legislature enacted an exception to the exercise of the housing authority's powers by providing that where there did not exist on September 15, 1945 (the effective date of the enactment), contracts for financial assistance between a housing authority and the federal government, no low rent housing or slum clearance project should thereafter be developed, constructed or owned by a housing authority except after consultation with the school district in which the project was located, and until the city council approved it by resolution. The city approval and declarations under the statute also serve the federal act requirements for city approval and declarations of existing need prior to entering into federal contracts for preliminary loans and annual contributions. (Title 42 U.S.C.A., § 1415(7)(a)(b).)

The clause in section 34313 saving therefrom projects as to which contracts for financial assistance from the federal government had already been signed, is a plain recognition by the state Legislature that it had no power to enact laws which would interfere with the obligations of those contracts. Likewise it manifests a legislative intent that when a project has progressed to the point of contractual obligations with

the federal government, it should proceed to completion unless the signatory bodies have the power to withdraw from or modify the agreements. This recognition is controlling on the city and, in the absence of modifications of existing contracts by mutual consent of the signatory bodies or with legislative sanction, requires the city to proceed.

It was pursuant to the 1945 amendment (now Health & Saf. Code § 34313) that the city council on August 8, 1949, adopted Ordinance No. 95,222 approving the project here involved.[2] Since that time, as noted, pursuant to the city's approval, contracts with the federal government have been signed and partially performed by the signatories by advances pursuant thereto. Thereunder obligations were incurred by the housing authority which bound it to performance whereby the amounts of the loans might be recouped from rentals realized from completed projects and repaid to the federal government. █ Section 34353 provides that the bonds of the housing authority are not an obligation of the city and that neither the bonds nor the obligations of the housing authority are payable out of funds or properties other than those of the housing authority; and that the obligations of the housing authority do not constitute an indebtedness within the meaning of constitutional or statutory debt limitations. These provisions erect a further barrier to the purported exercise of an asserted power by the city that it may "breach" the contracts and become liable in damages or for the repayment of the advances. If it could do so, the city council would be faced with the additional problem of power under the city's fundamental law to incur that indebtedness. No bonds as to this project have as yet been issued, but outstanding are $12,901,000 in short term notes of the housing authority with annual interest at 1.19 per cent, sold in the market and held by local banks.

█ A housing project under these acts is solely one to be financed in whole or in part by the federal government to meet the declared need for slum-clearance and low-rent housing construction (§ 34212). The time when the city might halt the project is before it has given the approval which authorizes the authority to proceed to make applications for

---

[2] The outcome makes it unnecessary to consider the contention of the petitioners that the city council's approval, having been given by ordinance (although resolution only was required), the purported rescission by resolution was invalid.

and procure the federal loans. When the declaration has been made, the project is approved, and is in the course of development and construction with the use of the borrowed funds, it is then too late for the city to withdraw except by express authority. As the provisions of the law hereinbefore referred to indicate, there is no inclusion of a power to proceed by abandonment or rescission. From that time the federal and the state acts contemplate completion of the statutory and contractual objectives. The city is given the power to prevent a project's being initiated, and no project under the state and federal law may be commenced or loans made without its approval and entry into a cooperation agreement. (42 U.S.C.A. §§ 1410, 1415(7) (a) (b).) It was obviously never assumed, and certainly it was not authorized by law, that after the city council had declared the need, had given requisite approvals of a project under state and federal law, and had undertaken binding commitments, it would or could repudiate them.

The matters and details as to which the city had power to exercise and to contract and as to which its contract was required under the federal act, were treated in the cooperation agreement, which also expressly provided that the contract should not be abrogated, changed or modified so long as bonds or other obligations, issued to aid in financing the development of the project, remained outstanding. As stated over $12,000,000 of housing authority obligations are outstanding. Thus the city and the authority, as well as the Legislature, have recognized that no action might be taken which would have the effect to prevent a fulfillment of those obligations.

■ The foregoing refutes the statement of the city that the power to approve a project includes the power to abandon it, and that it has the inherent power to determine that housing projects may be discontinued "whenever the public interest so requires." The city stated the public interest when it declared the need. Assuming materiality, the record shows that according to the last census there were in Los Angeles 69,000 families in substandard homes; that at the time this project was initiated private industry was still unable to cope with the situation; and that at the time of the purported rescission the need was still greatly in excess of the 10,000 authorized units which private industry, through governmental assistance or otherwise, could not meet.

■ The city also looks to a proviso in the Independent Offices Appropriation Act, 1952 (*supra,* Public Law, 137

82d Congress, 1st Sess., ch. 376, approved August 31, 1951). That proviso, after the date of its approval, prohibits authorization of the construction of projects initiated before or after March 1, 1949, in any locality in which such projects have been or may thereafter be rejected by the governing body of the locality or by the public vote, unless the projects have been subsequently approved by the same procedure through which the rejection was expressed. This proviso does not purport to grant a power to the city. It was dealing with the authority of the federal agency. As material here the proviso prohibits that agency's authorization of construction where the city had validly disapproved the project pursuant to state law. It does not purport to validate action of the city council which is invalid under state law. It is quite apparent that the local rejection referred to is that by which the city might withhold approval of the project. It deals with future action of the agency. It does not contemplate a case where, as here, the city has approved the project and the federal agency has authorized the construction. It does not give the agency power to rescind prior authorization of construction or repudiate the obligations incurred thereunder. This view is in accord with the opinion of the acting general counsel for the Public Housing Administration in a circular issued February 8, 1952.

Thus the federal act contemplates fulfillment of the objectives and the contracts. It also contains authority, to be exercised when deemed necessary or desirable *in the fulfillment of the objectives*, for consent to the modification, amendment or supersedure of existing contracts. An express exception prohibits exercise of that authority when it would impair the rights of holders of outstanding obligations of the public housing agency for which annual contributions have been pledged. (42 U.S.C.A. § 1414.) The federal act pledges the faith of the United States to the payment of all contracted annual contributions and authorizes appropriations in each fiscal year of the amounts necessary therefor. (42 U.S.C.A. § 1410(e).) That provision has never been deleted from the federal act. Therefore neither the state nor the federal law permits entire withdrawal from contracts, and the exercise of authority for modification is restricted to such as will not impair outstanding obligations which, it is obvious, the federal government has a direct interest in protecting.

The decisional law does not support the city's position. In *Brooks* v. *City of Gilroy*, 219 Cal. 766 [29 P.2d 212], aban-

donment by the city of a contract for construction work and improvement was in the exercise of an express power and right under the act involved, which also made provision for payment of obligations incurred. It is assumed that the rescission of prior action may appropriately be accomplished by a municipal legislative body where rights of third persons have not intervened. The application of this recognized principle is to matters of municipal concern. (*McConoughey* v. *Jackson*, 101 Cal. 265 [35 P. 863].) Here the state law is controlling in a matter of state concern. Thereby the city is authorized to contract in respect to the granted powers, but it is also bound to compliance therewith accordingly. (*Kleiber* v. *City & County of San Francisco, supra,* 18 Cal.2d 718, 724-725.)

As also shown in the Dockweiler case (*Housing Authority* v. *Dockweiler, supra,* 14 Cal.2d at pp. 456-457), with citation of *McNulty* v. *Owens,* 188 S.C. 377 [199 S.E. 425] (see, also, *Rutherford* v. *City of Great Falls,* 107 Mont. 512 [86 P.2d 656, 661]), the cooperation agreement is not an unauthorized attempt by the city to bind itself as to the exercise of governmental functions. It is simply an authorized contract to cooperate in the performance of those functions and as such is valid. Thus control of city streets is a governmental function which the city without authority may not by contract prohibit or curtail. (*Wills* v. *Los Angeles,* 209 Cal. 448 [287 P. 962, 69 A.L.R. 1044]; see, also, *Beals* v. *City of Los Angeles,* 23 Cal.2d 381, 386 [144 P.2d 839]; *County of San Diego* v. *California Water & Tel. Co.,* 30 Cal. 2d 817, 822, 824 [186 P.2d 124, 175 A.L.R. 747].) But as pointed out the city is authorized under the state law to cooperate by contract with the housing authority in the exercise of the granted power to close city streets, and in doing so is acting pursuant to the statute in a matter of state concern.

In this as in the other respects the general principle applies that the state grant of the powers and the authority to execute and enter into the contract to exercise those powers contemplates performance of the contract and implies no authority to breach it. (*California Highway Com.* v. *Riley,* 192 Cal. 97, 107-108 [218 P. 579].) Likewise the statute provides the method for the exercise of those powers, including the power to close streets. There is no merit in the contention that certain other statutes supply a method. The city concedes that the state has the power to control the streets and to provide the exclusive methods for the vacation of streets. The state has exercised that power in relation to housing proj-

ects in the Housing Authorities Law and the Housing Co-operation Law. ▮▮▮ The provision of section 34512 that the city may furnish, dedicate, close, etc., streets "which it is otherwise empowered to undertake" does not alter this meaning. The same phrase appears in section 34511 with reference to the furnishing of parks, sanitary and other facilities. The powers conferred are "supplemental to the powers conferred by any other law." (§ 34502.) These specific powers were not powers which the city did not theretofore possess when exercising them in relation to local matters. The meaning therefore is clear that the powers conferred by the statute are not those same powers, but are specially granted as supplemental to the local powers. They are to be exercised pursuant to the act by the same local governing body which otherwise would operate in relation to matters primarily of local concern where constitutional rights of compensation for the taking or damaging of private property for use in the project are also observed.

In *State ex rel. Great Falls Housing Authority* v. *City of Great Falls,* 110 Mont. 318 [100 P.2d 915], mandate was sought directing the city to comply with its agreement to rezone areas and vacate or close streets. In issuing the writ the court said (100 P.2d at p. 921) : "The refusal of the city council . . . to comply with the requests of the Authority to vacate the streets and re-zone the location was a useless act. The acts of the city council of a contractual nature cannot be repudiated by any subsequent council, whether the membership of the council be the same or not. When the council authorized the creation of the Great Falls Authority it assumed all the obligations involved essential to a perfected project." In declaring (at p. 922) that under the housing act both the city and the housing authority were state agents to achieve the state objectives, the court distinguished municipal and state powers and action, and was careful to admonish that the opinion should not be construed to impair the local self-government or home rule powers of the city. There is no inconsistency or disharmony in the city's functioning pursuant to its fundamental law in respect to municipal functions and powers, and pursuant to the state law as to specific powers granted in matters of state concern. (See, also, *State ex rel. Housing Authority* v. *City Council of the City of Helena, Montana* (March 29, 1952), —— Mont. —— [242 P.2d 250].)

In *Times-Mirror Co.* v. *Superior Court,* 3 Cal.2d 309 [44 P.2d 547], the city of Los Angeles attempted to withdraw

from and abandon condemnation proceedings to acquire land and properties of the Times-Mirror Company for use in a contemplated civic center. In the meantime the Times-Mirror had constructed a building on another location. The writ of mandamus issued in effect to prevent abandonment by the city of the pending condemnation proceedings by directing the respondent court to proceed with the trial of the condemnation action. The issuance of the writ was indicated by the application even as against the public body of the equitable doctrine of estoppel. This court, citing *City of Los Angeles* v. *Cohn,* 101 Cal. 373, observed (at p. 330 [35 P. 1002]) that there are limits beyond which even a city in representing the rights of the public might not go. That and the Cohn case constitute authority that the court is not bound by precedent in determining what facts and circumstances compel the issuance of the writ but that the writ will issue as against a city or other public body or officer wherever law and justice require such action. The present matter involves more than equity and justice. As has been noted the statutory provisions impose the duty upon the city to perform the administrative acts contemplated by the state legislative action in a matter of state concern. The policy of that law is not a matter of judicial concern or control. Both the Congress of the United States and the Legislature of this state have provided for the cooperative effort evidenced by the contracts between the city and the housing authority. Each of these entities as governmental agencies of the state was authorized to enter into the contracts here sought to be enforced as a public duty on the part of the city.

In brief, the city's acts and contracts are binding in accord with the statutory purpose and objective; and no provision is indicated which permits the city's attempted cancellation, abandonment and abrogation of its contracts. As noted, the extent to which projects begun with the use of federal funds might be canceled or modified is covered by the provisions of the law as to amendments, modifications or supersedure of existing contracts for federal loans and contributions, none of which is here involved. If it be desirable to include provisions for cancellation by city action, as distinguished from withholding of city approval prior to initiation, the subject is one to be addressed to the respective federal and state legislative bodies for appropriate permissible enactments which would protect the rights of all interested parties. Without such enactment the unauthorized summary action by the city

amounts to a failure of recognition of that concert of federal and state action on which the city in fact relies.

It is concluded that the law enjoins upon the city the duty to perform the terms of the agreements entered into with the housing authority and to go forward with the exercise of the powers which it has agreed to undertake in cooperating with that authority. On this record a direction that the city so proceed will afford the relief expedient to accomplish the purpose of the proceeding. It is of no concern that the mandate does not issue directing the specific powers to be exercised—since in many respects the details thereof are subject to the discretionary cooperative action of the city. The city does not contend that it will not go forward with the performance of the contracts if under the law it had no right or power to rescind the approval of the project or to cancel and abrogate the agreements.

Let the peremptory writ of mandate issue directing the respondents to perform the terms of the agreements entered into with the petitioner and to proceed in the fulfillment of its obligations thereunder.

Gibson, C. J., Edmonds, J., Carter, J., Traynor, J., and Spence, J., concurred.

Respondents' petition for a rehearing was denied May 19, 1952. Schauer, J., was of the opinion that the petition should be granted.