**CUYAHOGA METROPOLITAN HOUS-ING AUTHORITY, Plaintiff,**

v.

**CITY OF CLEVELAND et al., Defendants.**

**Civ. A. No. 72–222.**

United States District Court, N. D. Ohio, E. D.

May 5, 1972.

Walter C. Kelley, Fred J. Livingstone, Cleveland, Ohio, for plaintiff.

Nicholas DeVito, Malcolm Douglas,. Milton Schulman, Richard M. Harmody, William Van Aken, Cleveland, Ohio, for defendants.

## MEMORANDUM OPINION AND ORDER

BATTISTI, Chief Judge:

Cuyahoga Metropolitan Housing Authority (CMHA) has brought this action against the City of Cleveland and the members of the City Council of the City of Cleveland pursuant to 28 U.S.C. § 1331(a) to declare invalid the action of the City Council in adopting Ordinance No. 392–72 purporting to cancel its 1971 Cooperation Agreement with CMHA. In addition, CMHA seeks to have this court order the City to comply with said agreement.

On May 10, 1971, the Council of the City of Cleveland passed Ordinance No. 836–71 entitled "An Emergency Ordinance authorizing the execution of a Cooperation Agreement with the Cuyahoga Metropolitan Housing Authority for the development of and administration of 2,500 dwelling units for low income persons." Pursuant to the authorization granted him by Ordinance No. 836–71, the Mayor of the City of Cleveland, on May 21, 1971, on behalf of the City of Cleveland, entered into a Cooperation Agreement with CMHA. The City of Cleveland has received the substantial benefit of certification of its "Workable Program" by HUD because it executed the Cooperation Agreement. Such benefits accrued under other programs.

After execution of the Cooperation Agreement in May of 1971, CMHA in performance thereunder and in reliance upon this agreement instituted and engaged in the following activities.

General plans for the development of the 2,500 units over a 2½ year period under the Cooperation Agreement were conceived. It was decided that construction under the new agreement was to proceed in five separate phases which would result in the development of 2,000 family units and 500 elderly units.

For the first phase of development, CMHA requested a program reservation for 500 units from the Department of Housing and Urban Development (HUD), which was approved and granted. All of the 500 units in the first phase were designated for single family scattered site housing to be developed under the traditional Turnkey method of construction. However, the plans and approvals have been recently changed so that now 150 units are to be constructed under a Turnkey acquisition program.

CMHA hired an additional planner and real estate officer, and also created a new position of Deputy Director, in order to meet the new demands for the development of the 2,500 units and the various development programs thereunder and assigned additional staff to the development program. The CMHA staff developed a letter inviting proposals and containing criteria to be sent to proposed Turnkey developers which were approved by HUD. CMHA placed legal advertisements inviting proposals from developers for the development of 500 Turnkey units.

Pursuant to said advertised invitation, proposals from ten developers were received by CMHA for a total of 509 units, and thereafter the CMHA staff devoted considerable time and money to the evaluation of said proposals. After the CMHA staff and the CMHA Board tentatively approved over 100 proposed sites, the HUD staff spent considerable time and effort in evaluating and studying same.

After the proposed sites had been approved by the CMHA staff, the CMHA Board and HUD, the CMHA staff and Board also spent considerable time in evaluating the financial and construction aspects of the various Turnkey proposals. To date, the CMHA Board has approved plans for approximately 71 sites in all respects and has agreed to enter into development programs therefor. These proposed development programs have all been sent to HUD for funding by amendments to existing Annual Contributions Contracts but the City of Cleveland's actions have created a cloud and have resulted in delays in HUD's approval.

To date, CMHA has expended approximately $45,000 in the development and planning of the 500 scattered site units as the first stage of construction under the 1971 Cooperation Agreement. This development money will not be reimbursed by HUD unless and until the proposed units are approved by HUD for construction by the execution of a development program.

This latter action is dependent upon the existence of a Cooperation Agreement. Federal funds amounting to approximately 62.5 Million Dollars will be lost by CMHA, which loss will prevent CMHA from carrying out its statutorily mandated purpose of providing persons of low income with decent, safe, and sanitary housing. The Council of the City of Cleveland on March 27, 1972, passed Ordinance No. 392–72 which purports to repeal Ordinance No. 836–71 and to cancel the Cooperation Agreement authorized and executed thereunder.

The question before this court is whether the City may rescind the Cooperation Agreement under which it and CMHA have pursued their obligations for almost one year. This issue has been presented to at least three State courts, and all three have overturned or enjoined the municipality from repudiating or cancelling a valid Cooperation Agreement. State ex rel. Helena Housing Authority v. City Council of City of Helena, 125 Mont. 592, 242 P.2d 250 (1952); Housing Authority of City of Los Angeles v. City of Los Angeles, 38 Cal.2d 853, 243 P.2d 515 (1952); Housing Authority of City of Oakland v. City of Oakland, 222 Cal.App.2d 771, 35 Cal. Rptr. 527 (1963).

These courts held that subsequent legislation cancelling a Cooperation Agreement impairs the obligation of contract in violation of Article I, Section 10 of the United States Constitution. Subsequent to the three decisions, the United States Supreme Court decided City of El Paso v. Simmons, 379 U.S. 497, 85 S.Ct. 577, 13 L.Ed.2d 446 (1965). This case altered the scope of review under the contract clause and must be carefully reviewed.

In 1910 the Texas State Land Board sold some public land by contract calling for a small down payment plus annual interest and principal payment. State law provided for the termination of the contract and forfeiture of the land for nonpayment of interest. The purchaser or vendee could reinstate his claim on

written request and payment of delinquent interest, unless rights of third parties intervened. In 1941 the law was amended limiting reinstatement rights to five years from the forfeiture date. The land was forfeited in 1947. Simmons, thereafter, took quitclaim deeds to the land, filed for reinstatement and tendered payment more than five years later. The application was denied. In 1955 the State sold the land to the City of El Paso and Simmons filed suit to determine who had title. The District Court granted the City's motion for summary judgment on the ground of the 1941 statute. The Court of Appeals reversed. 320 F.2d 541 (5th Cir. 1963). They held that the right to reinstate was· a vested contractual right and that the 1941 statute constituted an impairment of Article I, § 10.

El Paso attempted to bring the case within the long line of cases recognizing a distinction between contract obligations and remedies and permitting a modification of the remedy as long as there was substantial impairment of the value of the obligation. Sturges v. Crowninshield, 4 Wheat. 122, 200, 4 L. Ed. 529 (1819); Von Hoffman v. City of Quincy, 4 Wall. 535, 553–554, 18 L. Ed. 403 (1866); Honeyman v. Jacobs, 306 U.S. 539, 59 S.Ct. 702, 83 L.Ed. 972 (1938). Mr. Justice White refused to review again the dividing line between "remedy" and "obligation". Rather he felt that . . . "it is not every modification of a contractual promise that impairs the obligation of contract under federal law, any more than it is every alteration of existing remedies that violates the Contract Clause". 379 U.S. at 507, 85 S.Ct. at 583. He felt that the modification of the provision for reinstatement after default did not contravene the contract clause.

The *El Paso* Court adopted the standard which Chief Justice Hughes announced in 1937 in Home Building & Loan Ass'n v. Blaisdell, 290 U.S. 398, 428, 54 S.Ct. 231, 236, 78 L.Ed. 413 (1937)

"But full recognition of the occasion and general purpose of the clause does not suffice to fix its precise scope. Nor does an examination of the details of prior legislation in the States yield criteria which can be considered controlling. To ascertain the scope of the constitutional prohibition, we examine the course of judicial decisions in its application. These put it beyond question that the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula. Justice Johnson, in Ogden v. Saunders, supra, page 286 of 12 Wheat., 6 L.Ed. 606, adverted to such a misdirected effort in these words: 'It appears to me, that a great part of the difficulties of the cause, arise from not giving sufficient weight to the general intent of this clause in the constitution, and subjecting it to a severe literal construction, which would be better adapted to special pleadings.' And, after giving his view as to the purport of the clause, 'that the States shall pass no law, attaching to the acts of individuals other effects or consequences than those attached to them by the laws existing at their date; and all contracts thus construed, shall be enforced according to their just and reasonable purport,' Justice Johnson added: 'But to assign to contracts, universally, a literal purport, and to exact from them a rigid literal fulfillment, could not have been the intent of the constitution. It is repelled by a hundred examples. Societies exercise a positive control as well over the inception, construction and fulfillment of contracts, as over the form and measure of the remedy to enforce them.' "

This standard when distilled to its essence is one of reasonableness, or a balancing test.[1] When determining whether the state or municipality's ac-

---

1. Mr. Justice Black in his dissent in *El Paso* notes that the language of Article I, § 10, like the First Amendment is couched in absolutist terms. As in the

tion is reasonable, one must never lose sight of Mr. Justice Johnson's statement in Ogden v. Saunders: "[i]t is the motive, the policy, the object, that must characterize the legislative act, to affect it with the imputation of violating the obligation of contracts." 12 Wheat. 213, 291, 6 L.Ed. 606 (1827)

 Therefore, it is clear that a state may neither modify nor affect the obligation of contract without restriction. As Chief Justice Hughes stated in *Blaisdell*:

"Whatever is reserved of state power must be consistent with the fair intent of the constitutional limitation of that power. The reserved power cannot be construed so as to destroy the limitation, nor is the limitation to be construed to destroy the reserved power in its essential aspects. They must be construed in harmony with each other. This principle precludes a construction which would permit the state to adapt as its policy the repudiation of debts or the destruction of contracts or the denial of means to enforce them." 290 U.S. at 439, 54 S.Ct. at 240.

Unlike *El Paso* where the Court held that the Texas statute impaired no protected right under the contract clause, in the case at bar contract rights are impaired and in fact extinguished by the repeal of the Cooperation Agreement. Before balancing the equities in the instant case an analysis of the Montana and California cases is appropriate.

In these cases subsequent legislation cancelling a Cooperation Agreement was held to have impaired the obligations of contract in violation of the contract clause of the Federal Constitution. In State ex rel. Helena Housing Authority v. City Council of City of Helena, 125 Mont. 592, 242 P.2d 250 (1952), the city and the housing authority entered into a Cooperation Agreement in connection with the development of a low rent housing project. After a building permit had been issued to the contractor, the city passed a resolution cancelling the Cooperation Agreement and notified the contractor that the permit had been revoked and rescinded. The housing authority petitioned for a writ of mandamus ordering the city to perform its contract by issuing the contractor a building permit and to otherwise comply with the terms of the Cooperation Agreement and further requested that the city council be restrained and enjoined from carrying out and executing the provisions of their resolutions cancelling and setting aside the Cooperation Agreement. The Supreme Court of Montana took the position that the city council could not cancel its Cooperation Agreement and ordered Council to specifically abide by the contract:

"After making a finding of necessity and entering into a cooperation agreement the City Council could not resort to repudiation of the contract to justify a change of mind about the advisability of the project." 242 P.2d at 255.

The court said further:

"The attempt of the City Council to rescind and revoke its cooperation agreement with the Helena Housing Authority was an attempt to avoid the solemn obligations of a contract freely entered into. The declaration in ordinance No. 1456 that 'the cooperation agreement shall be canceled and set aside' is an attempt on the part of the city in its legislative capacity to pass an ordinance impairing the obligations of a contract." *Id.*

The case of Housing Authority of City of Los Angeles v. City of Los Angeles, 38 Cal.2d 853, 243 P.2d 515 (1952) involved a proceeding in mandamus by the Los Angeles Housing Authority against the city to perform specified acts contemplated by a Cooperation Agreement between the parties. The California Supreme Court held that where the city had adopted a low rent

---

First Amendment cases he stands in lonely dissent, relying as he does on the exact terms of the instrument. See Black, The Bill of Rights, 35 NYU L.Rev. 865.

housing project and entered into a Cooperation Agreement with the Housing Authority, the city could not thereafter rescind the prior approval and abrogate the Cooperation Agreement. The court issued the writ of mandamus directing the city to perform the terms of the agreement entered into with the Housing Authority and to proceed in the fulfillment of its obligations thereunder. The California Supreme Court made the following analysis of the situation:

"The city is given the power to prevent a project's being initiated, and no project under the state and federal law may be commenced or loans made without its approval and entry into a cooperation agreement. 42 USCA, §§ 1410, 1415(7) (a, b). It was obviously never assumed, and certainly it was not authorized by law, that after the city council had declared the need, had given the requisite approvals of a project under state and federal law, and had undertaken binding commitments, it would or could repudiate them." 243 P.2d at 521.

(For other cases adopting this view see City of Walla Walla v. Walla Walla Water Co., 172 U.S. 1, 19 S.Ct. 77, 43 L.Ed. 341 (1898); Missouri and K. I. Ry. Co. v. City of Olathe, 156 F. 624 (C.C.Kan. 1907); City of Cincinnati v. Public Utilities Commission, 98 Ohio St. 320, 121 N.E. 688 (1918).

■ The City contends that a legislative body cannot bind its successor and that any law passed by one City Council is repealable, Bank of Toledo v. Toledo, 1 Ohio St. 622 (1853). This proposition, while generally valid, simply ignores the realities of the situation. Legislative bodies regularly enact statutes and enter into contracts which are, for all intents and purposes, unrepealable. Contracts or statutes entered into to build a building or a bridge or a dam can not be repealed at the next session of the legislative body, when certain parties have relied on that agreement, as

CMHA has in this case. Statutes such as this ordinance are particularly immune from repeal when it is impossible to make one party to the contract whole by the payment of money damages. This issue will be dealt with more fully later in this opinion.

In order to determine if City Council's action has violated the contract clause, the equities must now be balanced. CMHA is in the business of building public housing and was established as a body corporate and politic in 1937. It has expended more than $40,000 pursuant to this agreement. If it is unable to build the 2500 homes which it plans to build, it will lose approximately $62,500,000 in federal funds. In addition, it will be effectively precluded from carrying out its mandate of providing persons of low income with decent, safe and sanitary housing. Although CMHA will lose $62,500,000, the real losers will be the persons of low-income residing in the City of Cleveland. These people are the true parties in interest here. Without the efforts of CMHA, with federal funds, many persons of low-income can never · hope to live in a decent, safe and sanitary home in Cleveland.

When examined against these considerations, the City offers little. In fact, the City may suffer a greater loss than CMHA.

If the City's "workable program" is uncertified, when next it comes up for review, HUD may refuse to authorize any funds for Cleveland. These at present are far in excess of the $62,500,000 which CMHA will receive. These include Model Cities, Urban Renewal, Open Spaces and other moneys. On their side of the scale the City offers only an argument that they can repeal any ordinance any time it deems appropriate. According to the terms of the Cooperation Agreement, it could be cancelled only if one circumstance occurred and it has not.

■■ Section 10 of the Cooperation Agreement between the City and CMHA provides: .

"10. The Local Authority in the planning, construction, purchase or occupancy of any low-cost housing Project shall comply with all valid charter and ordinance provisions of the Municipality including but not limited to those relating to planning, platting, subdividing, zoning and sanitation. A breach of this subdivision by the Local Authority shall be grounds for cancellation by the Municipality of the within agreement as to units authorized herein which have not been approved in writing by the Government for processing by the Local Authority prior to such cancellation. Cancellation shall be by ordinance of Council passed and made effective pursuant to the charter of the Municipality [Provided, however, that nothing herein shall in any way modify or change the obligations of the Municipality as set forth in subdivisions 1 through 9 hereof as the same are referable to obligations arising as to any units approved in writing by the Government for processing by the Local Authority prior to the effective date of such cancellation."]

Under the time-honored rule of construction of *expressio unius est exclusio alterius,* the fact that the parties saw fit to provide this one specific situation in which the Cooperation Agreement could be cancelled demonstrates that all other situations are excluded. The defendant City and the defendant Councilmen proffer no reason for their purported cancellation of the Cooperation Agreement and thus the purported cancellation was an unjustified act.

Section 10 of the Cooperation Agreement only binds CMHA to comply with *valid* municipal ordinances. Ordinance No. 2092–52 referred to by *amici* which purports to require the approval of the Cleveland City Council the establishment of any new low rent housing project in the City of Cleveland is clearly not a valid ordinance for the following reasons.

■ Ordinance No. 2092–52 is an attempt by one political subdivision of the State of Ohio without statutory authority to interfere with the statutory power of another political subdivision which is carrying out a state public purpose. It is a fundamental principle of law that a municipal legislative authority cannot subject the state, or any of its agencies, to the municipality's laws in the absence of express statutory authority granted by the state legislature.

In the case of Willoughby Hills v. Board of Park Commissioners, 3 Ohio St.2d 49, 209 N.E.2d 162 (1965), the court held that:

"There being no statutory authority, a municipality may not require, by ordinance, that a park district, organized and existing under Section 1545.01 et seq., Revised Code, and being a political subdivision of the state of Ohio, collect and remit to the municipality an excise tax upon fees collected by the park district."

The Ohio Supreme Court went on to state: "The authority of a municipality to levy an admission tax is derived from the state Constitution (Section 3, Article XVIII) but it cannot interfere with a political subdivision of the state." *Id.* at 51, 209 N.E.2d at 163.

■ Like a park district, a metropolitan housing authority is a political subdivision of the State of Ohio which by delegation performs state functions which are governmental in character.

That there is no statutory authority for the City of Cleveland's attempted interference is clear. Ohio Revised Code, § 3735.44 in fact requires that local planning, zoning, and sanitary laws apply to housing projects of a metropolitan housing authority to the same extent as if said projects were planned, constructed, owned, or operated by private persons; however, Ordinance No. 2092–52 applies solely to housing projects within the meaning of the 1937 Housing Act.

Ordinance No. 2092–52 was an attempt by the City unilaterally to modify a Cooperation Agreement. In a memorandum opinion in the recent case of Davis v. City of Toledo, 54 F.R.D. 386 (N.D.Ohio W.D.), Judge Young held that where a Cooperation Agreement does not contain a provision giving City Council site selection veto power, the same cannot be exercised even if subsequently agreed to by the housing authority. In Davis, the Toledo Metropolitan Housing Authority (TMHA) proposed sites for low income housing and submitted them to the City Council for approval. The Council disapproved and TMHA acquiesced in the Council's action although it was clear that the Cooperation Agreement between the City and TMHA contained "no provision which in any way gives the City of Toledo power to approve or disapprove sites selected for low rent housing". The court specifically held that the TMHA was under no obligation to submit the proposed sites to the City Council and that it was equally clear that Council was acting without authority in vetoing the proposal. The court in Davis also reviewed the federal law that requires a Cooperation Agreement between a housing authority and a local legislative body, 42 U.S.C. Section 1415(7) (a), and the state law requiring local compliance with planning and zoning laws, Ohio Revised Code Section 3735.44, and held: "None of these [laws] gives City Council the power exercised here." The Cooperation Agreement between the City of Cleveland and CMHA likewise contain no provision for site approval.

The Ordinance contains no standards or criteria for approval or disapproval. Arguments based on alleged violations of Cleveland Ordinance No. 2092–52 have been raised in numerous lawsuits against CMHA seeking to halt housing projects. CMHA has prevailed in each case which sought to resurrect this old ordinance.

In the most recent case in which this Ordinance was raised, Evans et al. v. City of Cleveland et al., Cuyahoga County Common Pleas Court Case No. 872270, aff'd. Court of Appeals Case No. 30681 (1971), plaintiffs alleged that a housing project could not go forward because the City Council did not approve the site pursuant to the 1952 Ordinance. Both defendants, the City of Cleveland and CMHA, filed Motions to Dismiss and in the alternative Motions for Summary Judgment. The City of Cleveland, in its Brief in Support of its Motion for Summary Judgment, argued that Ordinance No. 2092–52 was invalid and unconstitutional. In fact, the City's position is clearly stated in an argument heading which reads:

"ORDINANCE NO. 2092–52 IS UNCONSTITUTIONAL, IRRELEVANT, INVALID ON ITS FACE AND IS IN EFFECT AN ATTEMPT TO INVADE A STATE AGENCY'S ACTION."

In Evans, the Common Pleas Court sustained CMHA's Motion to Dismiss and the City of Cleveland's Motion for Summary Judgment and the Court of Appeals affirmed.

Arguments based on alleged violations of Ordinance No. 2092–52 were also raised in the case of Richard Harmody v. CMHA, Cuyahoga County Common Pleas Court Case No. 866259, aff'd Court of Appeals Case No. 29677. In the Harmody case, both the Common Pleas Court and the Court of Appeals for Cuyahoga County upheld CMHA's demurrer to the Amended Petition on the grounds that plaintiff lacked capacity to bring the action and the Petition failed to state a cause of action against defendant CMHA.

Most significantly, however, the City of Cleveland has never considered this Ordinance to be valid or effective and has never sought to enforce it. This has been clearly expressed in law department memoranda dated March 16, 1961, and October 14, 1968.

For the reasons that Ordinance No. 2092–52 is an invalid exercise of municipal power contrary to state law, and in direct conflict with the Coopera-

tion Agreement between CMHA and the City of Cleveland, it is clear that CMHA's failure to submit projects for approval of the City Council is not in violation of a valid ordinance of the City of Cleveland and therefore may not serve as justification for cancellation of the Cooperation Agreement.

When one balances the equities in this case and applies the test of reasonableness, the action of the City Council must be held to be an impairment of the obligation of contract in violation of Article I, § 10. Plaintiff and amici curiae raise additional matters which merit discussion.

The plaintiff contends that the Cooperation Agreement may not be cancelled without the consent of the federal government.

■ The Cooperation Agreement provides in Section 9 *inter alia*:

"So long as any contract between the Local Authority and the Government for loans (including preliminary loans) or annual contribution, or both, in connection with any Project remains in force and effect, or so long as any bonds issued in connection with any Project or any monies due to the Government in connection with any Project remain unpaid, *this Agreement shall not be abrogated, changed, or modified without the consent of the Government.*" (Emphasis added.)

This section of the Cooperation Agreement is required by the government as a matter of Federal law in order to protect the government because of the obligations which it assumes based upon the existence of a Cooperation Agreement. Thus, the parties to the Cooperation Agreement, in this case CMHA and the City of Cleveland, must agree to give the government a beneficial interest in the Cooperation Agreement so that said Agreement may not be cancelled by the parties even should they mutually agree to do so unless the prior consent of the government is obtained.

Pursuant to its general rule-making power under § 8 of the United States Housing Act of 1937, 42 U.S.C. Section 1408, HUD has issued a Low-Rent Housing Application and Preliminary Loans Guide. This Guide, HPMC-FHA G 7404.1, provides that HUD requires as a prerequisite to approving an Application for a Low-Rent Housing Program that the Local Authority submit to the Area Office of HUD an executed Cooperation Agreement. This Agreement must be approved by the Area Office Legal Counsel and the proper forms for it are available from HUD. These forms provide without exception that a Cooperation Agreement may not be abrogated, changed, or modified without the consent of the government so long as there exists an Annual Contributions Contract between the government and the local authority. This HUD manual and this provision of the Cooperation Agreement preventing abrogation, change or modification are mandated under HUD's rule-making power as federal law, pursuant to the Supremacy Clause of The United States Constitution (Article VI, Cl. 2). See Thorpe v. Housing Authority of City of Durham, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969). Thus, the Cooperation Agreement, which has the status of federal law, in itself is effective in eliminating any possibility that a municipality can rescind such an Agreement in the manner in which the defendants have purported to do in the instant case.

The Congress of the United States has established a clear national policy of remedying the shortage of decent, safe and sanitary housing. The United States Housing Act of 1937 provides *inter alia*:

"it is . . . the policy of the United States to promote the general welfare of the Nation by employing its funds and credit . . . to assist the several States and their political subdivisions . . . to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent,

safe, and sanitary dwellings for families of low income . . . that are injurious to the health, safety, and morals of the citizens of the Nation." United States Housing Act of 1937, § 1, 42 U.S.C. § 1401.

In order to implement this national policy, Congress established the Low-Rent Public Housing Program and had continued to fund this program at increasing levels since 1937. In Ranjel v. City of Lansing, 293 F.Supp. 301, 308 (W.D.Mich.1969), rev'd on other grounds) 417 F.2d 321 (6th Cir. 1969), Judge Fox stated:

> "While development under the turnkey program is not directly controlled by the federal government, that program is a significant part of the congressional attempt to provide adequate housing for disadvantaged persons, many of whom are members of minority groups."

See Crow et al. v. Brown et al., 332 F. Supp. 382 (N.D.Ga.1971).

The federal housing law establishes a comprehensive scheme for federal involvement in the development of low rent public housing. For this involvement to be triggered, it is required that an initial local determination of need be made and that based on that determination a Cooperation Agreement be entered into. 42 U.S.C. Section 1415(7) (b). Once a municipality has made such an initial determination of need and entered into a Cooperation Agreement based thereon, commitment of federal government resources to further implement the national housing policy within that municipality is assured and authorized. The federal laws regulating the federal commitment, being triggered by the municipality's initial determination, via a Cooperation Agreement, must be read so as to prohibit repudiation of said Agreement. Otherwise, the federal scheme and national policy could be impeded and completely abrogated by municipal action. Clearly, 42 U.S.C. Section 1415(7) (b) cannot be read so as to authorize such result. See Housing Authority of City of Los Angeles v. City of Los Angeles, 38 Cal.2d 853, 243 P.2d 515 at 521 (1952).

█ Therefore, having violated the national housing policy as set forth in the Housing Act of 1937, the action of the defendants is in violation of the Supremacy Clause of the United States Constitution. The plaintiff herein does not question the requirement of 42 U.S. C. Section 1415(7) (b) that an initial local determination of need be made and a Cooperation Agreement executed, because in the instant case the determination has been made and the Agreement entered into.

Amici curiae have suggested that a fiscal officer's certificate of availability of funds should have been attached to the Cooperation Agreement. The provisions of Section 5705.41 of the Revised Code, however, clearly have no application to the Cooperation Agreement.

Section 5705.41 provides *inter alia*: "No subdivision or taxing unit shall:

. . . . .

D. Make any contract or give any order involving the expenditure of money unless there is attached thereto a certificate of the fiscal officer of the subdivision that the amount required to meet the same, or in the case of a continuing contract to be performed in whole, or in part, in an ensuing fiscal year, the amount required to meet the same in the fiscal year in which the contract is made, has been lawfully appropriated for such purpose and is in the treasury or in process of collection to the credit of an appropriate fund free from any previous encumbrances."

█ The Cooperation Agreement of 1971 is not a contract which involves the expenditure of money by the City of Cleveland. Under said Agreement, the defendant City binds itself only to cooperate with the plaintiff and generally to furnish the same municipal services to the plaintiff that are furnished to other property owners. All of the specific expenditures of money which are incurred

as a result of the Cooperation Agreement involve the expenditure of funds by the plaintiff and HUD. Thus, clearly Section 5705.41 of the Revised Code of Ohio has no application to a contract of such a nature, for to require a fiscal officer to certify the availability of funds where specific funds need not be employed is a vain act. See Ohio Water Service Co. v. City of Washington, 131 Ohio St. 459, 3 N.E.2d 422 (1936) which holds that the provisions of General Code Section 5625-33(d) (now Revised Code 5705.41) do not apply to contracts between public utilities and political subdivisions. In that case, the Ohio Supreme Court relied on the clear distinction between the obligation of contracts with public utilities and "the obligation of usual and ordinary contracts" in which the other party has the right to name the price for which it is willing to perform. Thus, in a situation where a subdivision contracts with a public utility with respect to the provision of services and the total cost is not ascertainable, no certificate of the availability of funds is required of the fiscal officer of the subdivision.

Amici curiae represent individuals who were leaders of the initiative movement to repeal the Cooperation Agreement. These groups consist largely of home owners on the West Side of the City of Cleveland, where much of the scattered-site housing is to be built. Their opposition to public housing has been very vocal. While these people will not admit publicly that they entertain any bias or prejudice against members of the Negro race or other minorities, these considerations clearly, in part, influence their thinking. They clearly object to having large numbers of low-income Negroes move into their all-White neighborhoods. They fear, among other things, a depreciation in the property values in the district and an increase in violence which they feel will follow the movement of public housing. In keeping with these views, amici curiae have appended to their brief numerous newspaper articles which indicate, in their

view, ample evidence of danger to the general public to warrant cancellation of the Cooperation Agreement pursuant to the police power granted to the Cleveland City Council pursuant to Article XVIII, § 3 of the Ohio Constitution. This argument is most unfortunate because it appeals only to the basest of emotions and fears. Neither CMHA nor the concept of dispersed public housing represent a panacea for the ills of this society. Yet were it not for CMHA and those who have striven mightily for more than a century to bring equal rights to all, this country might not be as integrated as it is. The assumptions implicit in this argument is that tax dollars should not be used to promote integration in our society. It is unbelievable that 18 years after Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), such arguments can be made by intelligent people. This nation is committed to a policy of equal rights and opportunities for all its citizens. It is too late in the day to attempt to change this country's wise decision to move toward this goal.

As Mr. Justice Harlan (the elder) held in his dissent in Plessy v. Ferguson, 163 U.S. 537, 554–555, 16 S.Ct. 1138, 1145, 41 L.Ed. 256:

"In respect of civil rights, common to all citizens, the constitution of the United States does not, I think, permit any public authority to know the race of those entitled to be protected in the enjoyment of such rights. Every true man has pride of race, and under appropriate circumstances when the rights of others, his equals before the law, are not to be affected, it is his privilege to express such pride and to take such action based upon it as to him seems proper. But I deny that any legislative body or judicial tribunal may have regard to the race of citizens when the civil rights of those citizens are involved. Indeed, such legislation as that here in question, is inconsistent not only with that equality of rights which pertains to citizenship, national and state, but with the

personal liberty enjoyed by every one within the United States.

"The thirteenth amendment does not permit the withholding or the deprivation of any right necessarily inhering in freedom. It not only struck down the institution of slavery as previously existing in the United States, but it prevents the imposition of any burdens or disabilities that constitute badges of slavery or servitude. It decreed universal civil freedom in this country. This court has so adjudged. But that amendment having been found inadequate to the protection of the rights of those who had been in slavery, it was followed by the fourteenth amendment, which added greatly to the dignity and glory of American citizenship, and to the security of personal liberty, by declaring that 'all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside,' and that 'no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.' These two amendments, if enforced according to their true intent and meaning, will protect all the civil rights that pertain to freedom and citizenship. Finally, and to the end that no citizen should be denied, on account of his race, the privilege of participating in the political control of his country, it was declared by the fifteenth amendment that 'the right of citizens of the United States to vote shall not be denied or abridged by the United States or by any state on account of race, color or previous condition of servitude.'"

Amici imply that we should ignore the wise counsel of this eminent Justice and revert to an older and disreputed line of reasoning. This Court will not so do, for this would heap additional indignities on a race of Americans who have suffered abuse, hunger, poverty and enslavement in this most wealthy of countries.

Mr. Justice Harlan, again in dissent, said in the Civil Rights Cases, 109 U.S. 3, 61–62, 3 S.Ct. 18, 57, 27 L.Ed. 835 (1883):

. . . What the nation, through Congress, has sought to accomplish in reference to that race, is—what had already been done in every State of the Union for the white race—to secure and protect rights belonging to them as freemen and citizens; nothing more. It was not deemed enough 'to help the feeble up, but to support him after.' The one underlying purpose of congressional legislation has been to enable the black race to take the rank of mere citizens. The difficulty has been to compel a recognition of the legal right of the black race to take the rank of citizens, and to secure the enjoyment of privileges belonging, under the law, to them as a component part of the people for whose welfare and happiness government is ordained. At every step, in this direction, the nation has been confronted with class tyranny, which a contemporary English historian says is, of all tyrannies, the most intolerable, 'for it is ubiquitous in its operation, and weighs, perhaps, most heavily on those whose obscurity or distance would withdraw them from the notice of a single despot.' Today, it is the colored race which is denied, by corporations and individuals wielding public authority, rights fundamental in their freedom and citizenship. At some future time, it may be that some other race will fall under the ban of race discrimination. If the constitutional amendments be enforced, according to the intent with which, as I conceive, they were adopted, there cannot be, in this republic, any class of human beings in practical subjection to another class, with power in the latter to dole out to the former just such privileges as they may choose to grant. The supreme law of

the land has decreed that no authority shall be exercised in this country upon the basis of discrimination, in respect of civil rights, against freemen and citizens because of their race, color, or previous condition of servitude. To that decree—for the due enforcement of which, by appropriate legislation, Congress has been invested with express power—*every one must bow, whatever may have been, or whatever now are, his individual views as to the wisdom or policy, either of the recent changes in the fundamental law, or of the legislation which has been enacted to give them effect.* (Emphasis supplied.)

The plaintiff seeks a permanent injunction in this cause.

 In reliance upon the Cooperation Agreement, CMHA has obtained a Program Reservation from the Department of Housing and Urban Development, obtained the approval of HUD to invite bids for the development of projects authorized in said Cooperation Agreement, invited bids for such projects, and devoted considerable staff time to the planning and development of the low rent public housing units authorized by said Cooperation Agreement. Additionally, HUD, at CMHA's request, has reviewed sites and caused appraisals of same to be made. Also in reliance on the Cooperation Agreement and CMHA's invitations to bid, numerous developers and builders have expended considerable time and money in submitting bids to CMHA. In total, CMHA has expended approximately $45,000.00 in funds in reliance upon the Cooperation Agreement.

Public corporations like the plaintiff CMHA are created for the sole purpose of carrying out their assigned public purposes. The plaintiff's public purpose is to provide decent, safe and sanitary housing for persons of low income. (See Ohio Revised Code, Section 3735.31.) In carrying out this statutorily mandated public purpose, the plaintiff becomes of necessity a trustee of the rights of the persons of low income that it serves. These low income persons

that CMHA by law is to serve will be damaged irreparably should CMHA's ability to provide decent, safe and sanitary low rent public housing for them be jeopardized. CMHA, both directly and through the beneficiaries of its public purposes, will be injured to the extent of approximately $62,500,000.00 in federal subsidies which will not be provided should the defendants City and Councilmen be permitted to carry forth the purported cancellation of the Cooperation Agreement. This sum of money represents the average cost of one unit of housing ($25,000.00) multiplied by the number of units contemplated by the Cooperation Agreement (2,500). In addition, the beneficiaries of public housing including residents and potential residents will be denied access to and availability of these 2,500 units at federally subsidized rental amounts. The average monthly rental in the City of Cleveland being $100.00 and the average rent charged by CMHA to elderly being $41.00 and to families being $60.00, low income persons will be denied substantial benefits of the public housing program.

It is also important to note the racially discriminatory effect of the purported cancellation of the Cooperation Agreement. As testified to by Director Fitzgerald, CMHA has a waiting list of approximately 5,600 persons. Of these persons, 4,200 or 75% are Black and 1,400 or 25% are White. In addition the proportion of Black persons on the waiting list for family units, as opposed to elderly units, is greater than the proportion of Blacks on the overall waiting list. The 500 scattered site units, the development of which marks the commencement of development under the Cooperation Agreement for 2,500 units, are all for family use. Thus, the cancellation of this Cooperation Agreement would have the effect of deprivation and discrimination primarily against Blacks. See Dailey v. City of Lawton, Okl., 296 F.Supp. 266 (W.D.Okl.1969).

In carrying forward with its statutorily imposed duties under state and federal law, CMHA must continue to pur-

sue the development of low rent public housing projects within its jurisdictional area. The actions of the defendants in harassing CMHA have a ripple-like effect on all of CMHA's contractual, quasi-contractual, and statutorily mandated relationships. Developers and builders will refuse to deal further with CMHA since the binding effect of the Cooperation Agreement with the City of Cleveland has been called into question. HUD has refused to approve development programs and execute any further Amendments to its Annual Contributions Contract with CMHA, which contract is the very life-blood of public housing because it serves to channel the necessary federal subsidy to such housing. HUD has refused to continue to pursue the procedures which lead to development of a low rent public housing project since these procedures require the devotion of considerable HUD staff time and money.

It is obvious that CMHA and the people of Cleveland cannot be made whole by money damages. One cannot evaluate a decent, safe and sanitary home, the demise of racial divisions in a city, nor place a price on human dignity. The cost to the society of the continuation of racial segregation, de facto or de jure, may only be fairly judged when one considers the loss that this country suffered in men and material between 1861 and 1865.

Therefore, it is hereby ordered that the 1971 Cooperation Agreement between the City of Cleveland and CMHA is declared to be a valid and subsisting contract between the parties; that it has not been nor will be cancelled by virtue of Ordinance No. 392–72, which is declared to be unlawful, null and void; that the defendants are permanently enjoined from any further proceedings or actions in violation of or interference with plaintiff's rights under the 1971 Cooperation Agreement; and that the defendants are ordered to comply with said contract and perform all provisions thereof.

It is so ordered.