Artie **MAHALEY** et al., Plaintiffs,

v.

**CUYAHOGA METROPOLITAN HOUSING AUTHORITY** et al., Defendants.

Dorothy M. **HARRISON** et al., Plaintiffs,

v.

**CUYAHOGA METROPOLITAN HOUSING AUTHORITY** et al., Defendants.

Civ. A. Nos. C 71–251, C 72–67.

United States District Court, N. D. Ohio, E. D.

Feb. 22, 1973.

For appearances of counsel, see 355 F.Supp. 1245.

BATTISTI, Chief Judge:

## MEMORANDUM OPINION AND ORDER

The remainder of these consolidated actions have been remanded for my further consideration. The findings of fact set forth in the opinion of the panel 355 F.Supp. 1245 are incorporated herein. The question remaining before the court is whether the defendants have used the consent requirement as a tool to perpetuate segregation in violation of 42 U.S. C. § 1983.

Cuyahoga County is a racially segregated county. The population of Cuyahoga County in 1970 was 1,721,300; 328,419 (19.1%) of whom were Negro. 87% of these 328,419 Negroes reside in Cleveland. Of the 40,578 who reside outside of Cleveland but within Cuyahoga County, 80% live in three eastern suburbs: 23,196 in the City of East Cleveland; 5,250 in Shaker Heights; and 4,007 in Warrensville Heights. In 1970 the defendant City of Garfield Heights had 1,789 Negro (4.6%) residents. All but two resided in one area of Garfield Heights adjacent to the City of Cleveland. The other four defendant suburban cities' population in 1970 was from 99.1% to 99.8% Caucasian.

In Banks et al. v. Perk et al., 341 F. Supp. 1175 (N.D.Ohio 1972) the following findings of fact were made as to the City of Cleveland and are incorporated herein:

"The City of Cleveland is a racially divided city. Except for a small pocket of Negroes on the west side of the Cuyahoga River, in the Bellaire Section, almost all (96%) of the Negro citizens of the City live on the east

side of the River. The Negro population of the City of Cleveland has grown dramatically since 1930 when Negroes constituted only 8% of the total population of the City. Today it is more than 38%. Since 1950 three neighborhoods on the east side of Cleveland, Hough, Glenville and Lee-Seville, have changed from primarily White to almost entirely Negro. As a result, the schools in the City of Cleveland are quite badly segregated. Of the 183 public schools in the City, 85 are 90% to 100% Negro, and 72 are under 10% Negro. Approximately 95% of the Negro children attending public schools in the City attend schools which are all or substantially all Negro. In addition, in the last six years more than 5,000 jobs have moved from Cleveland's inner city to the outskirts of the City and to nearby suburbs. Access to these jobs has decreased for those who live in the inner city." 341 F.Supp. at 1178.

To live in the inner city is all too often not a badge of slavery. Often it is a badge of poverty. Far too often, indeed quite regularly in this city, it is a badge or indicia of both slavery and poverty. Being relegated to live in the decaying center of a city is tragic indeed. Its effects are legion—segregated schools of poor quality, denial of access to jobs, ineffective health services, generally poorer health, higher rate of infant mortality—the list seems endless. The only contact far too many of us have with the center of Cleveland is what we see as we drive from our downtown offices to our homes which ring the center city. At present, Cuyahoga County has the racial shape of a donut, with the Negroes in the hole and with mostly Whites occupying the ring.

There is no question that there is a need for low income housing throughout Cuyahoga County. As of November 30, 1971, there were 5,652 pending applications to all CMHA housing units. 73% of these applicants were Negro. 4,040 of the pending applications were for family rather than elderly units. 86% of these applications for family units were made by Negroes. The average waiting period of an applicant for CMHA housing was as follows:

| Bedroom Needed | Average Waiting Time |
|---|---|
| Efficiency | No Wait |
| One | 2 Months |
| Two | 8 Months |
| Three | 12 Months |
| Four | 12 Months |
| Five | 18 Months |
| Six or more | 3 Years or more |

Many of the pending applications for admission into CMHA housing units are from families who reside in a municipality within Cuyahoga County other than the City of Cleveland. 484 persons who presently reside in CMHA housing located in the City of Cleveland were residents of a municipality in Cuyahoga County other than the City of Cleveland at the time they became residents of CMHA housing.

CMHA and the Planning Commission of Cleveland have made studies which show a need for many additional units of low rent housing within the territorial jurisdiction of CMHA both in Cleveland and in Cuyahoga County outside Cleveland. These studies show the need for low rent housing in every municipality within Cuyahoga County including the defendant suburban cities. The records of the Cuyahoga County Welfare Department show that there are residents in each of the defendant suburban cities who receive public assistance. Persons receiving such assistance are among those who qualify for admission to CMHA housing. Actually there may be more.

Since 1968 the national policy of HUD has been the dispersal of low rent housing outside the Negro and lowest income neighborhoods. Recently defendant CMHA has adopted this policy within Cleveland, see Banks v. Perk, supra, and has attempted to follow this policy in the suburbs of Cleveland. CMHA has sought Cooperation Agreements with all of Cleveland's suburbs but has received no positive response. The City of Cleve-

land signed Cooperation Agreements in 1937, 1941, 1949 and most recently in 1971. These agreements authorized CMHA to build a total of 14,000 units in Cleveland.

Prior to the commencement of C 71–251, CMHA wrote to the Mayor or City Manager of every municipality within its territorial jurisdiction, including the suburban defendants, concerning low rent public housing programs available to suburban communities and enclosed with each letter a brochure describing their housing programs. No response was received from any suburban city, except Parma Heights, not a defendant herein, which indicated that it would not permit subsidized housing in their community. Prior to the commencement of C 71–251, staff representatives of CMHA contacted representatives of many suburban municipalities within the territorial jurisdiction of CMHA concerning various low rent public housing programs available to their communities. CMHA mailed its 1969 Annual Report to the Mayor of each municipality in Cuyahoga County which contained a request that all municipalities consider low rent public housing for their communities. In 1970 The Cleveland Planning Commission recommended that the city, in association with CMHA, press for Cooperation Agreements with the greatest possible number of suburban municipalities in order to offer low income families a wider choice of housing options in the entire region.

In January, 1971, The Cleveland Planning Commission recommended that each community in the county accept a number of public housing units equalling 2% of the total families residing in the community because the City of Cleveland could not be expected to solve the entire low income housing crisis. It is clear that if there is to be a solution, it must be within the framework of a regional housing market. In keeping with the approach, the Director of CMHA met with the Mayor of the City of Garfield Heights in 1969 and discussed public housing for that city and the need for a Cooperation Agreement. In late 1969 or early 1970, the Mayor of the City of Westlake met with CMHA officials and the low income housing programs available and the requirements of a Cooperation Agreement were explained to him.

In 1969 CMHA officials met with the Mayor of Euclid and proposed a project on some city owned vacant land. The Director of CMHA met with the Mayor and President of City Council of Euclid at their request in 1971 and discussed public housing programs to solve relocation problems caused by the demolition of approximately 550 units of the City of Euclid's Briardale Housing Project. Such units have been demolished in the last two years without making any further provisions for low income housing within the City.

At a meeting in the City of Parma attended by the Mayor, the CMHA Director gave information regarding public housing, its benefits and the requirement of a Cooperation Agreement. CMHA officials have spoken as often as possible to any and all groups regarding the public housing program and the Cooperation Agreement. At each of the meetings with officials and representatives of the defendant suburbs, the CMHA Board's policy of being ready and willing to take any and all steps necessary for the development of low income housing in the respective suburbs was explained and it was understood that all that was necessary to start the process was an initial approval or indication of interest by the respective surburb. No favorable response, indication of further interest, or request for further study of CMHA pro-. grams, has ever been received by CMHA from the various meetings and discussions it has had with officials and representatives of the defendant suburbs or from the correspondence sent.

On March 1, 1972, Director Fitzgerald sent another letter to all the Mayors and Chief Executives in their territorial jurisdiction. The only response was extremely negative. On September 1, 1972 another such letter was sent. This let-

ter enclosed an updated study of the need for low income housing in each municipality within CMHA's territorial jurisdiction. This letter stands unanswered. It should be noted that the cities of Cleveland, East Cleveland, Oakwood and Cleveland Heights have Cooperation Agreements with CMHA.

CMHA's policy toward these suits is largely neutral in that they stand ready to negotiate a Cooperation Agreement with each and every city in Cuyahoga County and simultaneously stand ready to build without the necessity of the Agreement, should this court so decide. However, it is particularly troubling that suburban officials have largely ignored CMHA's requests to negotiate a Cooperation Agreement. Clearly, there is a need in each community within the territorial jurisdiction of CMHA. There is an approximate need for the following number of additional units of low income family and elderly housing in each of the defendant suburbs:

|  | Family | Elderly |
|---|---|---|
| Euclid | 1545 | 252 |
| Garfield Heights | 931 | 151 |
| Parma | 1873 | 232 |
| Solon | 145 | 13 |
| Westlake | 233 | 38 |

There is a total need of 4,727 family units and 686 elderly units of public housing in the defendant suburbs. There is an approximate need of an additional 35,778 family units and 6,314 elderly units of public housing in the City of Cleveland.

If Cleveland is to become a thriving city once more, its housing needs must be met and its housing patterns must not perpetuate segregation. An avenue must be found to allow inner city dwellers to move to the suburbs, where many of the jobs have been moving. In *Banks* CMHA and the City of Cleveland were charged with the leadership to integrate housing patterns in Cleveland. This can

only be viewed as a temporary solution. CMHA, the City of Cleveland and the municipalities within Cuyahoga County must act together if segregation in racial housing patterns is to be once and forever eliminated.

The Housing Act of 1937, as amended in 1949, 42 U.S.C. § 1401 et seq.[1] established "the goal of a decent home and a suitable living environment for every American family." The 1964 Act mandated that "no person . . . be excluded from participation in, be denied the benefits of or be subjected to discrimination under any program or activity receiving Federal financial assistance." In 1968 Congress proclaimed that the policy of the United States is to provide fair housing throughout the nation. And in recent HUD regulations the duty of local agencies to develop balanced and dispersed public housing in non-racially concentrated areas has been mandated.

The impact of this policy on governmental units throughout the United States can be seen in the recent judicial decisions interpreting the national policy. In Shannon v. HUD, 436 F. 2d 809, 816 (3rd Cir. 1970), the court stated:

"Read together, the Housing Act of 1949 and the Civil Rights Act of 1964 and 1968 show a progression in the thinking of Congress as to what factors significantly contributed to urban blight and what steps must be taken to reverse the trend or to prevent the recurrence of such blight . . . Whatever were the most significant features of a workable program for community improvement in 1949, *by 1964 such a program had to be non-discriminatory in its effects, and by 1968 the Secretary had to affirmatively promote fair housing.*" 432 F.2d at 816. (Emphasis added.)

And in Crow v. Brown, 332 F.Supp. 382, 390 (N.D.Ga.1971) aff'd. 457 F.2d 788

---

1. The question of the constitutionality of this section has been briefed. The court has found the arguments of CMHA most compelling and has largely adopted its analysis.

(5th Cir. 1972), Judge Edenfeld summarized the impact of this policy by stating:

"For better or worse, both by legislative act and judicial decision, this nation is committed to a policy of balanced and dispersed public housing. (Citations omitted). Among other things, this reflects the recognition that in the *area of public housing local authorities can no more confine low-income blacks to a compacted and concentrated area than they can confine their children to segregated schools.*" (Emphasis added.)

The court in *Crow* found that the municipality's actions frustrated attempts made by the Atlanta Housing Authority to reverse the trend of racial concentration and held:

"Taken together and viewed in their historical context, the actions of the County in resisting attempts designed to achieve the national housing policy of balanced and dispersed public housing and failing to assist such attempts violate the Equal Protection Clause of the Fourteenth Amendment. Relief from this violation of the constitutional and statutory rights of plaintiffs (blacks on AHA waiting list) must be granted by this court."

See also Banks v. Perk, 341 F.Supp. 1175 (N.D.Ohio 1972).

In view of the factual showings of the almost all-white character of the suburbs, the high percentage of Negroes in CMHA housing and on CMHA waiting lists, and the need for low income housing both on a community and on a metropolitan basis, the refusals or failures to respond to CMHA's requests to initiate public housing were intended to, and have had the effect of excluding Negroes and perpetuating racial segregation contrary to the national housing policy.

■ It is a well established point of law that intention or motive to discriminate need not be directly proven in order to establish discrimination contrary to the Fourteenth Amendment, the various Civil Rights statutes or the national housing policy. " 'equal protection of the laws' means more than merely the absence of governmental action designed to discriminate." Hawkins v. Town of Shaw, Mississippi, 437 F.2d 1286 (5th Cir. 1971). "If proof of a civil right violation depends on an open statement by an official of an intent to discriminate, the Fourteenth Amendment offers little solace to those seeking its protection." Dailey v. Lawton, 296 F.Supp. 266, aff'd. 425 F.2d 1037 (10th Cir. 1970).

Judge J. Skelly Wright has succinctly expressed the rationale for looking to the effect of a party's actions or inactions:

"Whatever the law once was, it is a testament to our maturing concept of equality that, with the help of Supreme Court decisions in the last decade, we now firmly recognize that the *arbitrary quality of thoughtlessness can be as disastrous and unfair to private rights and [to] the public interest as the perversity of a willful scheme.*" (Emphasis added.)

Hobson v. Hansen, 269 F.Supp. 401, 497 (D.D.C.1967), aff'd. sub nom., Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F.2d 175 (1969) (en banc).

Many civil rights cases brought against municipalities for interference, indifference, or inaction relative to attempts to alleviate segregation within their jurisdictions by the development of public housing have held that when the result of said action is discrimination it cannot be viewed as within the normal bounds of municipal discretion. See Crow v. Brown, 332 F.Supp. 382 (N.D. Ga.1971), aff'd. 457 F.2d 788 (5th Cir. 1972); Kennedy Park Homes Association v. City of Lackawanna, 318 F.Supp. 669 (W.D.N.Y.), aff'd. 436 F.2d 108 (2d Cir. 1970), cert. denied, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971); Dailey v. City of Lawton, 296 F.Supp. 266 (W.D.Okl.1969), aff'd. 425 F.2d 1037 (10th Cir. 1970); Hawkins v. Town of Shaw, Mississippi, 437 F.2d

1286 (5th Cir. 1971); Banks v. Perk, 341 F.Supp. 1175 (N.D.Ohio 1972).

■ The teaching of these cases is that any municipal conduct which has the purpose or effect of discriminating against Negroes or perpetuating racial concentration or segregation in housing is violative of the civil rights of Negroes and a denial of equal protection, absent a showing by the municipality of a supervening and compelling necessity. Under the rule of these cases, given a *prima facie* showing of discriminatory effect, the cities must come forward with a supervening necessity or compelling interest to overcome a finding of discrimination. Crow v. Brown, *supra;* Kennedy Park Homes Association v. City of Lackawanna, *supra.*

The case of Crow v. Brown, 332 F. Supp. 382 (N.D.Ga.1971), aff'd. 457 F. 2d 788 (5th Cir. 1972) is applicable. *Crow* dealt with the housing crisis in Atlanta and its surrounding suburbs, but the elements and roots of Atlanta's problems are very similar to the problems demonstrated on the record herein. Most of Atlanta's public housing had been built in the central city in or near the slums. At the time suit was brought, approximately 75% of Atlanta's public housing was located in predominantly Negro areas. Also, as in Cleveland, over 80% of the tenants on the waiting list for public housing were Negro. The innercity-suburban situation is also analogous. As the trial court found:

> While poor blacks have been attracted to the low-rent public housing in Atlanta and the city's problems have rapidly mounted, whites have been fleeing in increasing numbers. In 1960 35% of the residents of Atlanta were black; today 51% are black. The public school population of Atlanta was 30% black; today it is 70% black. A fair percentage of the whites leaving Atlanta have moved to the unincorporated areas of Fulton County; a similar percentage of blacks from those areas have moved to the city.

Within the immediate future, unless drastic changes occur, it is not merely possible but certain that Atlanta will become, in essence, a black city within a solid white perimeter. *Id.* at 384.

In *Crow* not a single unit of low rent public housing had been built in the unincorporated areas of the county outside the city. The case arose when county officials failed to give necessary approvals and permits for the construction of two of the first federally subsidized low income housing projects to go into the all-white county. The consequences of racial segregation and concentration in Atlanta parallel Dr. Turner's (expert witness for the plaintiffs) appraisal herein, for as the court found:

> "One of the consequences of this racial concentration is that it has become virtually impossible to achieve meaningful school desegregation . . . a second consequence has been a swelling of the unemployment rolls in the City since job opportunities have become more scarce each year. Although they have increased in the suburbs.

> It is entirely possible that a greater concentration of Negroes in the central cities would be accompanied by an increase in tension and violence." *Id.* at 391.

In light of the above, the court in *Crow* found the county's actions in failing to permit and assist the construction of the public housing to be unconstitutional under the Equal Protection Clause of the Fourteenth Amendment. It held:

> "The County defendants testified that they are aware of these conditions, yet they have come forward with *no justification, compelling or otherwise,* for their passivity, their refusal to cooperate, indeed their active opposition to plans designed to alleviate them.

> Given the decisions previously cited, it is abundantly clear that, *in the absence of supervening necessity any county action or inaction intended to perpetuate or which in effect does perpetuate the conditions just de-*

*scribed cannot stand.* Nor can county action or inaction which would thwart their correction be permitted to continue." (Emphasis added.)

It is important to note that in Crow the court disregarded the Atlanta-Fulton County boundary line in reviewing the metropolitan housing crisis. It found the county's resistance to the achievement of the goals of the national housing policy, balanced and dispersed public housing, to be violative of the constitution. Although it could be argued that this was only permissible because the Atlanta Housing Authority had a Cooperation Agreement with Fulton County, this argument fails. The Cooperation Agreement Requirement itself indicates its only purpose is that there be a "local determination of the need for low rent housing" and thus, given a metropolitan housing crisis caused by segregated housing together with attempts to alleviate same, it does not matter whether the unconstitutional inaction and impediment to correction is occasioned by improper application of local ordinance or federal law. The deprivations and discriminatory effect are the same.

In Kennedy Park Homes Ass'n v. City of Lackawanna, 436 F.2d 108 (2d Cir. 1970) similar municipal interference with a housing project being developed in an all-white area of a highly segregated city was held violative of the prospective tenants' rights to be free from discrimination. Mr. Justice Clark writing for the Court held:

> The plaintiffs sought to exercise their constitutional right of 'freedom from discrimination by the States in the enjoyment of property rights.' Shelley v. Kraemer, 334 U.S. 1, 20, 68 S.Ct. 836, 845, 92 L.Ed. 1161 (1948). The effect of Lackawanna's action was inescapably adverse to the enjoyment of this right. In such circumstances the City must show a compelling governmental interest in order to overcome a finding of unconstitutionality. Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). The City has failed to dem-

onstrate an interest so compelling." *Id.* at 114.

In *Lackawanna* the city officials argued that whatever the effect of their actions, it resulted from thoughtlessness rather than a purposeful scheme and thus was not unconstitutional. The court rejected that argument and stated that even if this were the case:

> "the City may not escape responsibility for placing its black citizens under a severe disadvantage which it cannot justify." *Id.*

And in Dailey v. City of Lawton, 425 F.2d 1037 (10th Cir. 1970) after finding a *prima facie* showing of discrimination the court said:

> "The racial prejudice alleged and established by the plaintiffs must be met by something more than bold, conclusory assertions that the action was taken for other than discriminatory reasons." *Id.* at 1039–1040.

In Banks v. Perk, 341 F.Supp. 1175 (N.D.Ohio 1972) this test was applied in finding the City of Cleveland guilty of discrimination, in holding that:

> "in the absence of any supervening necessity or compelling governmental interest, any municipal action or inaction, overt, subtle or concealed, which perpetuates or reasonably could perpetuate discrimination, especially in public housing, cannot be tolerated."

See also, Hawkins v. Town of Shaw, Mississippi, 437 F.2d 1286 (5th Cir. 1971).

As found in *Crow* and *Banks,* the above test of discrimination is no less applicable if the discriminatory effect results from mere failures or refusal to act as opposed to overtly affirmative discriminatory action. The inaction is just as much "state action under color of law" as the overt act and thus comes within the ambit of the Equal Protection Clause of the Fourteenth Amendment. As was stated in Avery v. Midland County, 390 U.S. 474, 484, 88 S.Ct. 1114, 1120, 20 L.Ed.2d 45 (1968):

> " . . . a decision not to exercise a function with (a municipality's)

. . . power—a decision, for example, not to build an airport or a library, or not to participate in the federal food stamp program—is just as much a decision affecting all citizens of the county as an affirmative decision."

And in Burton v. Wilmington Parking Authority, 365 U.S. 715, 725, 81 S.Ct. 856, 861, 6 L.Ed.2d 45 (1961) the Supreme Court held that inaction of a state agency, as lessor, in failing to affirmatively require non-discrimination on the part of a lessee, was nevertheless "state action". In so holding, the Court stated:

*"No State may effectively abdicate its responsibilities by either ignoring them or by merely failing to discharge them whatever the motive may be.* It is no consolation to the individual denied the equal protection of the laws that it was done in good faith . . . "* (Emphasis added.)

■ Where there is *prima facie* evidence of discrimination, the burden is shifted to the defendant suburbs to come forward with a supervening necessity or compelling governmental interest to avoid a finding of unconstitutionality. See *e. g.*, Kennedy Park Homes Ass'n v. City of Lackawanna, *supra;* Crow v. Brown, *supra;* Banks v. Perk, *supra.*

■ The suburban defendants offer no compelling reason to justify their failure to sign a Cooperation Agreement. The defendant suburbs made bald allegations that their failure to act or enter into Cooperation Agreements was not motivated by racially discriminatory reasons. They offered only allegations of no need for low income housing and their fear of a property tax loss. Neither reason was supported by the evidence, and the latter should not be considered adequate or compelling even if proof had been offered.

The evidence indicates a need for additional public housing in the entire county and in each suburb as well. The 1970 CMHA study, the Fair Share Plan, and the 1972 CMHA study all convincingly indicate and demonstrate this

need. Against this, is the bare assertion that there is no need. Such an assertion must fall before the weight of the evidence.

The only other argument or rationalization offered for the failure or refusal of the defendant suburbs to enter into a Cooperation Agreement has been an alleged fear that the introduction of tax exempt public housing within a municipality would result in a financial loss. However, there was absolutely no evidence introduced to support said allegation. In fact, the evidence was to the contrary. Norman Krumholz, Director of the City Planning Commission of the City of Cleveland, testified that with sound planning and cooperation between a municipal or county planning commission and a housing authority, a plan could be devised for the development of public housing which would not reduce the net revenue to an individual municipality or to the county as a whole.

■ Even if there were some proof of tax loss, this fact is insufficient. Property of CMHA is exempt from taxation by virtue of state law pursuant to Section 3735.34, Ohio Revised Code. If the state has seen fit to exempt housing authority property from taxation, the municipalities have no authority to interfere with the statutory powers of another political subdivision. Willoughby Hills v. Board of Park Commissioners, 3 Ohio St.2d 49, 209 N.E.2d 162 (1965). The use of these transparent and flimsy rationalizations indicates quite clearly that the conduct of the municipalities was designed to exclude public housing and the Negroes who, obviously, will inhabit this type of housing.

■ The evidence amply demonstrates that the suburban defendants' failures and refusals to contract, negotiate with CMHA, or enter into Cooperation Agreements, have the clear effect of discriminating against Negroes by excluding them from residing in these suburban municipalities and perpetuating existing racial concentration and segregation within the individual sub-

urbs and throughout the metropolitan area. In the face of this evidence, the suburban defendants came forward with no logical rationale, compelling or otherwise, to explain their conduct. The record indicates that the actions of the defendant suburbs under color of law, discriminate against Negroes and other low income persons. Such actions violate the plaintiffs' rights to equal protection of the law under the Fourteenth Amendment to the United States Constitution and are in violation of their rights under the various Civil Rights Acts. See 42 U.S.C. Sections 1981, 1982, 1983, 2000d and 3601 et seq.

The national housing policy requires that CMHA develop public housing on a balanced and dispersed basis. See 42 U.S.C. Section 2000d and HUD Site Selection Criteria, 24 C.F.R. Chapter II, Part 200, Subpart N. This duty has been recognized by a number of courts. In Crow v. Brown, 332 F.Supp. 382, 390 (N.D.Ga.1971), aff'd. 457 F.2d 788 (5th Cir. 1972), the court stated:

"(B)oth by legislative act and judicial decision, this nation is committed to a policy of balances and dispersed public housing. See Kennedy Park Homes Ass'n v. City of Lackawanna, 318 F, Supp. 669 (W.D.N.Y.), aff'd. 436 F.2d 108 (2d Cir. 1970), cert. denied, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971); Dailey v. City of Lawton, 296 F.Supp. 266 (W.D.Okl.1969), aff'd. 425 F.2d 1037 (10th Cir. 1970); Gautreaux v. Chicago Housing Authority, 296 F.Supp. 907 (N.D.Ill. 1969), enforced in 304 F.Supp. 736, aff'd. 436 F.2d 306 (7th Cir. 1970), cert. denied, 402 U.S. 922, 91 S.Ct. 1378, 28 L.Ed.2d 661 (1971); Hicks v. Weaver, 302 F.Supp. 619 (E.D.La. 1969).

■ CMHA acts as an agent and instrumentality of the federal government in carrying out the national housing policy. It would be inconsistent then to read the Cooperation Agreement Requirement so as to give the defendant suburbs the power to arbitrarily say "no" to the implementation of this federal policy. Rather, the Requirement must be read as only authorizing the defendant suburbs to make a good faith, objective determination of need. If there is in fact no need for low income housing, then the determination should stand. But where a known and proven need is clearly present, the defendant suburbs cannot be permitted to thwart the implementation of the national policy by ignoring the need or by making arbitrary determinations to the contrary.

In SASSO v. City of Union City, 424 F.2d 291 (9th Cir. 1970) the Ninth Circuit stated:

"Given the recognized importance to equal opportunities in housing, it may well be, *as matter of law*, that it is the *responsibility of a city* and its planning officials *to see that the city's plan* as initiated or as it develops *accommodates the needs of its low-income families*, who usually—if not always—are *members of minority groups.*" (Emphasis added.)

See also, Banks v. Perk, 341 F.Supp. 1175 (N.D.Ohio 1972).

■ Thus, the Cooperation Agreement Requirement of federal law in delegating federal discretion to the local governing bodies of the defendant suburbs carries along with it the requirement that this discretion be exercised in light of the national housing policy of balanced and dispersed public housing. The conduct of the defendant suburbs therefore violates the spirit and letter of the national housing policy, CMHA's rights and duties thereunder, and the Fourteenth Amendment.

The City of Cleveland's entire defense has centered on the reasonableness and alleged sufficiency of the 1971 Cooperation Agreement with CMHA. However, the events and actions leading to the execution of that Cooperation Agreement and the City's subsequent actions in revoking building permits for public housing and in attempting to cancel the Agreement are all inconsistent with the

City's position and contrary to the above developed law. The legality of many of these acts on the part of the separate defendant, City of Cleveland, have already been ruled upon by the court in Banks v. Perk, 341 F.Supp. 1175 (N.D. Ohio 1972) and in CMHA v. City of Cleveland, 342 F.Supp. 250 (N.D.Ohio 1972) aff'd 473 F.2d 910 (6th Cir. 1973). Both of these cases have been affirmed by the United States Court of Appeals for the Sixth Circuit.

It was, however, established in these cases that Cleveland's actions in revoking building permits for public housing projects in white areas were in part based on racial considerations and constituted discrimination against the low income Negroes who were residents in and on the waiting list for CMHA public housing. And in CMHA v. Cleveland, *supra*, this court found that the City's attempt to cancel the 1971 Agreement impaired the obligations of CMHA's contract with the City, constituted harassment of CMHA, interfered with its contractual relationship and its contractors, and effectively discriminated against CMHA's beneficiaries.

Since Cleveland has signed a Cooperation Agreement, since it is subject to this court's jurisdiction in Banks v. Perk, *supra*, and since the Cooperation Agreement could not be repealed, CMHA v. City of Cleveland, *supra*, Cleveland cannot be held to have used the Cooperation Agreement requirement in a discriminatory manner. However, should it be held that the Cleveland City Council may repeal its Cooperation Agreement with CMHA or should CMHA exhaust the units available under the 1971 agreement, the principles stated above would apply to Cleveland should it then fail to enter into a Cooperation Agreement.

The refusal or failure of the defendant suburbs to make a determination of need for public housing in their communities is arbitrary and unreasonable in the face of the clear evidence of such need. Such action or inaction can be found to have intended the exclusion of not only the low income poor, which CMHA was created to house, but more particularly low income Negroes who make up a large percentage of CMHA's occupancy and waiting list.

The foregoing is contrary to the Thirteenth Amendment and the due process and equal protection clauses of the Fourteenth Amendment of the United States Constitution, the Civil Rights Act of 1964 and 1968, Title 42 U.S.C. Sections 1981, 1982, 1983, 2000d and 3601 et seq., the United States Housing Act of 1937 as amended, and regulations of the Department of Housing and Urban Development.

This court is faced with a dilemma of some constitutional significance. It is clear that state officials are acting under color of law and are performing acts which have, at the very least, discriminatory effect. However, the law they are using to perpetuate discrimination is a federal rather than a state law. State officials are refusing to sign a federally required document with the resulting effect of discrimination. Two potential solutions are offered. One is the issuance of a declaration that this statute is unconstitutional as applied. While this argument is beguiling, it simply does not accurately describe the remedy. The statute is not unconstitutional as applied to the plaintiffs but rather it has been used in such a way as to perpetuate discrimination. It has been argued that state officials cannot abuse a federal requirement to promote segregation because to do so would violate Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954) and Hurd v. Hodge, 334 U.S. 24, 68 S.Ct. 847, 92 L. Ed. 1187 (1948). This argument is also beguiling but not compelling for *Bolling* was the application of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) to the District of Columbia, and Hurd v. Hodge applied Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) to the District of Columbia. It is true that *Bolling* incorporated the equal protection guarantees within the due process clause

of the Fifth Amendment. But these cases cannot be applied in this cause in such a way as to declare this statute unconstitutional. To do so would bend *Bolling* and *Hurd* far out of shape. Therefore the statute ought not to be declared unconstitutional.

A second solution has been proposed. This method is far more complicated than the first but seems to be the only constitutionally permissible solution. CMHA is ordered to prepare a plan setting forth the number of scattered site units it intends to place in each of the defendant suburbs. The plan should reflect the needs of each suburban city for low income and elderly housing and should indicate the number of units which would be used to house those residents of the City of Cleveland who wish to move into that community. In preparing the plan CMHA should examine the needs of each suburban community in Cuyahoga County recognizing that it can only be effectuated as to the defendant suburban cities. It should not include specific locations in each suburb, but should rather reflect a numerical need. The plan is to be submitted within 90 days. Objections and any counter-proposals are to be submitted 90 days thereafter by the plaintiffs and the defendants. Included in the objections should be an analysis of the reasons why the defendant suburbs cannot absorb the number of houses which CMHA desires to build there. This court recognizes that it is the responsibility of the defendant suburbs to accept their constitutional obligation in this matter. Therefore it encourages that during the next 180 days negotiations be begun with CMHA in order that an amicable resolution be attained. Should negotiations prove fruitless, a hearing will be held soon after the receipt of the objections. It is anticipated that the cities may offer some reasons in opposition to CMHA's plan. Unless the reasons presented at the subsequent hearing are constitutionally permissible and meet the compelling interest test, there will be no alternative but to conclude that the sub-

urb's failure to sign a Cooperation Agreement is for a constitutionally impermissible reason, to wit: racial discrimination and appropriate judicial action will be undertaken.

### ORDER

The Cuyahoga Metropolitan Housing Authority is ordered to submit a plan to this court which indicates as accurately as possible the number of units which are necessary to reflect the need of each suburban city for low-income and elderly housing and should indicate the number of units to be used to house those residents of the City of Cleveland who would wish to move into that community. The plan should reflect the needs of each municipality in Cuyahoga County. The plan should be submitted within 90 days. Objections to the CMHA plan should be filed 90 days thereafter.

It is so ordered.