THE STATE, EX REL. NATIONAL CITY BANK ET AL., *v.* BOARD OF EDUCATION OF THE CLEVELAND CITY SCHOOL DISTRICT ET AL.

(No. 77-1248—Decided November 16, 1977.)

*Mr. Victor E. DeMarco, Mr. Dennis M. Kelly, Messrs. Jones, Day, Reavis & Pogue, Mr. Marc L. Swartzbaugh, Mr. John W. Edwards II, Mr. David W. Hart, Mr. Thomas F. Harvey* and *Mr. Roland E. Remley III,* for relators.

*Messrs. Squire, Sanders & Dempsey, Mr. George J. Meisel, Mr. Charles F. Clarke, Bustamante, Donahoe, Palmisano & Co., L. P. A.,* and *Mr. John H. Bustamante,* for respondents Board of Education et al.

*Mr. John T. Corrigan,* prosecuting attorney, and *Mr. Thomas P. Gill,* for respondents County Auditor and County Treasurer.

*Per Curiam.* There are two questions presented by this action. First, whether relators are entitled to a writ of

mandamus under state law; and second, whether the allowance of the writ would improperly encroach upon the jurisdiction of the District Court in the pending desegregation action in which respondent board is a defendant.

## I.

In order to be entitled to a writ of mandamus, relators must show (1) that they have a clear legal right to the relief prayed for, (2) that respondents are under a clear legal duty to perform the acts, and (3) that relators have no plain and adequate remedy in the ordinary course of the law. See *State, ex rel. Long,* v. *Bettman* (1970), 24 Ohio St. 2d 16, 17, 262 N. E. 2d 859; *State, ex rel. Pressley,* v. *Indus. Comm.* (1967), 11 Ohio St. 2d 141, 228 N. E. 2d 631.

R. C. 133.301 provides in part:

"[I]n anticipation of the collection of current tax revenues in and for any fiscal year, the board of education of any school district may borrow money and issue notes therefor * * *. The sums so anticipated *shall be deemed appropriated* for the payment of such notes at maturity." (Emphasis added.)

By resolution, the board issued the tax anticipation notes to relators pursuant to R. C. 133.301. The resolution stated that the board had levied taxes sufficient to "discharge such notes at maturity" and further provided that:

"Such tax shall be placed before and in preference to all other items and for the full amount thereof. The funds derived from such tax levy are *irrevocably pledged* for the payment of the interest and principal of such notes when and as the same fall due." (Emphasis added.)

To insure that a sufficient amount of appropriated funds will be available for payment of such notes at maturity, the General Assembly has established a procedure which must be followed by taxing authorities, including boards of education.

R. C. 5705.03 provides that every taxing authority shall "levy such taxes annually as are necessary to pay the interest and sinking fund on and retire at maturity the * * * notes * * * of such subdivision and taxing unit, including

levies in anticipation of which the subdivision or taxing unit has incurred indebtedness."

R. C. 5705.09(C) requires every taxing authority to establish a bond retirement fund into which it must pay sufficient revenues to retire serial bonds, notes, and certificates of indebtedness at maturity.

R. C. 5705.10, which governs the distributions of revenue derived from tax levies, provides in relevant part:

"*All revenue derived from general or special levies for debt charges * * * which is levied for the debt charges on serial bonds, notes, or certificates of indebtedness having a life of less than five years, shall be paid into the bond retirement fund*; and all such revenue which is levied for the debt charges on all other bonds, notes, or certificates of indebtedness shall be paid into the sinking fund.".. (Emphasis added.)

*R. C. 321.34 requires the county auditor to allocate separately sufficient advance tax revenue for the payment of the board's outstanding indebtedness and to issue warrants for use in retiring the debt at maturity.*

The above statutes establish a clear legal duty upon respondents. An absolute priority exists to retire the tax anticipation notes in preference to general operating expenses of the board. This priority comports with Section 11 of Article XII of the Constitution of Ohio which provides:

"No bonded indebtedness of the state, or any political subdivisions thereof, shall be incurred or renewed, unless, in the legislation under which such indebtedness is incurred or renewed, provision is made for levying and collecting annually by taxation an amount sufficient to pay the interest on said bonds, and to provide a sinking fund for their final redemption at maturity."

Section 11 of Article XII of the Constitution of Ohio imposes a mandatory duty upon the state and its political subdivisions to pay the interest and principal of their indebtedness before provisions are to be made for current operating expenses. See, *e. g., State, ex rel. Bruml,* v. *Brooklyn* (1933), 126 Ohio St. 459, 185 N. E. 841; *State, ex*

*rel. Alden Corp.*, v. *Solon* (1937), 132 Ohio St. 362, 7 N. E. 2d 550. It bespeaks the will of the people of this state regarding fiscal policy, and contributes to the excellent credit standing enjoyed by our governmental entities prior to the situation which precipitated the action at bar.

Further strengthening relators' claims for immediate relief is *Davis* v. *State, ex rel. Pecsok* (1936), 130 Ohio St. 411, 200 N. E. 181, which held that tax anticipation notes can be paid only from the tax revenues in anticipation of which they were issued. Since, in that case, the anticipated tax revenues were expended for other purposes and thus were unavailable for payments of the notes at maturity, the holder of the notes was held to have no remedies available to recover the monies which it advanced.

The *Davis* case has not been overruled.

Relators understandably assert that, under *Davis*, if the tax revenues are expended for current operating expenses, relators will be unable to secure payments for the notes at maturity or at any future date.

Relators are entitled to a writ of mandamus directing respondents to perform their clear statutory duties; respondents' continued refusal to do so represents an affront to the Constitution of this state, which they have taken an oath to uphold.

The sole question remaining is whether this court has the jurisdiction to issue and enforce a writ of mandamus, in view of the action pending in the District Court.

## II.

Original jurisdiction is conferred on this court in mandamus actions by Section 2(B)(1)(b) of Article IV of the Constitution of Ohio. Section 2(B)(3) of Article IV states that no law shall be passed or rule made whereby any person shall be prevented from invoking the original jurisdiction of this court. See *State, ex rel. Pressley*, v. *Indus. Comm., supra.*

Respondents urge that this court has no jurisdiction to issue a writ which would force them to violate the valid orders of a federal district court. We need not address that complaint because the allowance of the writ would not

necessitate that respondents violate the District Court's order to keep the schools open. The proceedings in that court reveal that respondents have not exhausted all of the alternatives pointed out to them in that action. The problems of the board and of desegregation are unquestionably the concern of the District Court. The concern of this court is to uphold and enforce the laws and Constitution of this state.

Respondents assert as a proposition of law that a district court in a school desegregation case has broad equity powers to order actions necessary to accomplish desegregation, even actions which contravene state laws. We do not dispute the validity of that statement. However, such powers do not conflict with this court's jurisdiction in the case at bar.

We believe in, and endeavor to fastidiously adhere to, the principles of federal-state judicial comity. Furthermore, we are acutely aware of the expansion of the equity powers of the district courts in order to implement desegregation. As the United States Supreme Court stated in *North Carolina State Board of Education* v. *Swann* (1971), 402 U. S. 43, 45:

"* * * [I]f a state-imposed limitation on a school authority's discretion operates to inhibit or obstruct the operation of a unitary school system or impede the disestablishing of a dual school system, it must fall; state policy must give way when it operates to hinder vindication of federal constitutional guarantees."

Examples of upheld broadened power of the District Court in desegregation cases include the power (1) to order the levying of taxes to reopen, operate and maintain school systems; (2) to postpone elections scheduled under state law to provide for the stability of a board of education; (3) to vacate seats on local boards and to designate how those seats would be filled; and (4) to appoint key officials at local high schools. See, *e. g.*, *Morgan* v. *McDonough* (C. A. 1, 1977), 548 F. 2d 28; *United States* v. *Missouri* (E. D. Mo. 1975), 388 F. Supp. 1058, affirmed in part (C. A. 8, 1975), 515 F. 2d 1365, certiorari denied 423 U. S. 951; *Bradley* v. *School*

*Board of Richmond* (E. D. Va. 1971), 325 F. Supp. 828; *Plaquemines Parish School Board* v. *United States* (C. A. 5, 1969), 415 F. 2d 817; and *Griffin* v. *School Board of Prince Edward County* (1964), 377 U. S. 218.

However, in all cases where such expanded powers have been used, the purpose was to implement or facilitate desegregation. Under the instant facts, we are constrained to conclude that the actions of the District Court would have exactly the opposite effect. If the result of that court's order to keep the schools open is a default upon the tax anticipation notes, it is clear that school desegregation would be hindered, not promoted; not only in Cleveland, but in every school district which must depend upon borrowed funds in order to function adequately.

Tax anticipation notes are a vital tool in school financing because of the uneven and staggered distribution of tax revenues. In purchasing the instant notes, relators extended credit in reliance upon undisputed contractual, statutory and constitutional obligations; they will suffer irreparable and significant injury if the notes are not paid out of 1977 tax revenues. A default upon these notes, if incurred through judicial action or inaction, would decimate the borrowing status of every school district in Ohio, and would effectively deny quality education to untold thousands of our children.

We cannot conceive of a power in any court to ignore neutral state law under the guise of implementing desegregation, when its action, in fact, would denigrate the desegregation process by crippling the borrowing power of the entire school system.

It is the duty of this court to uphold state laws and state constitutional provisions designed to protect the financial integrity of state bodies. The devastating effect of a failure of this court to perform that duty under the facts at bar is obvious and would be immediate.*

---

*As Judge Weick noted for the United States Court of Appeals for the Sixth Circuit on November 10, 1977:

"It is * * * unfortunate that recently Moody's has lifted its rating for Cleveland School District bonds from A-1 so that its bonds are

The writ of mandamus is allowed and respondents are directed to perform their duties in conformity with this decision.

*Writ allowed.*

O'Neill, C. J., Herbert, Celebrezze, W. Brown, P. Brown, Sweeney and Locher, JJ., concur.

no longer rated by Moody's. Without such rating the Board may have difficulty in selling its bonds to finance necessary projects." *National City Bank* and *The Cleveland Trust Co.* v. *Battisti, Chief Judge,* Civil No. 77-3532 (C. A. 6, November 10, 1977), at page 8 of the opinion.

"The system of rating securities was originated by John Moody in 1909.

"The purpose of Moody's Ratings is to provide the American investor with a simple system of gradation by which the relative investment qualities of bonds may be noted." Moody's Investors Service, Inc., Moody's Bank and Finance Manual v (1973).