**UNITED STATES of America, Plaintiff-Appellee,**

v.

**CITY OF PARMA, OHIO, Defendant-Appellant.**

No. 81–3031.

United States Court of Appeals, Sixth Circuit.

Dec. 10, 1981.

Robert R. Soltis, Andrew Boyko, Sol., Parma, Ohio, for defendant-appellant.

Michael L. Barrett, Brian F. Heffernan, Theodore Shaw, Miriam R. Eisenstein, Walter W. Barnett, James P. Turner, Dept. of Justice, Civil Rights Division, Washington, D. C., for plaintiff-appellee.

Before LIVELY, KEITH and MERRITT, Circuit Judges.

### ORDER

Less than a majority of the judges in active service having favored consideration *en banc* of the petition for rehearing, 661 F.2d 562 (6th Cir.), filed herein by the defendant-appellant, the petition has been referred to the hearing panel for disposition. Upon consideration the court concludes that all issues raised in the petition for rehearing were considered and decided by the court upon the original submission and that rehearing is not required.

The petition for rehearing is denied.

WEICK, Circuit Judge, dissenting:

I respectfully dissent from the denial of en banc consideration of Parma's appeal.

This case, following the pattern and practice of federal courts in the desegregation of Ohio's public schools by forced bussing, involves a similar effort to desegregate the residential neighborhoods of Ohio's municipalities by specific performance of the Fair Housing Act, 42 U.S.C. 3601 *et seq.* The decision of Chief Judge Battisti, who considered the case for seven years before deciding it and its affirmance by a divided panel of this court, 661 F.2d 562, has engendered considerable publicity in the media. Typical is an editorial appearing in The Cincinnati Enquirer of February 1, 1981, entitled "The Judiciary, Parma falls victim to another excess by a federal court", a copy of which is appended hereto.

I favored and voted for en banc consideration of Parma's petition for rehearing for the reasons set forth therein supported by the authorities therein relied upon which in my opinion compel a different result. Principally, the decision of Judge Battisti and a majority of the panel conflicts with the decisions of another panel of this court in

*Mahaley v. Cuyahoga Metropolitan Housing Authority, et al.,* 500 F.2d 1087 (6th Cir. 1974), *cert. denied,* 419 U.S. 1108, 95 S.Ct. 781, 42 L.Ed.2d 805 (1975) and *Joseph Skillken & Co. v. City of Toledo,* 528 F.2d 867 (6th Cir. 1975) and 558 F.2d 350 (6th Cir. 1977), *cert. denied,* 434 U.S. 985, 98 S.Ct. 611, 54 L.Ed.2d 479 (1977), *rehearing denied,* 434 U.S. 1051, 98 S.Ct. 904, 54 L.Ed.2d 805 (1978). It also conflicts with the decision of the Supreme Court in *James v. Valtierra,* 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971). It is not uncommon in our court for one panel of this court to write an opinion conflicting with the decision of another panel. This was commented upon with supporting citations by the Harvard Law Review article in Volume 92, pages 931, 934 and 935 (1979). *Mahaley* requires different treatment because it involved similar issues of fact and law with identical parties or their privies so as to invoke the doctrine of *res judicata,* which we are required to comply with if not *stare decisis.* We also should follow decisions of the Supreme Court.

In *Federated Department Stores, Inc. v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 2427, 69 L.Ed.2d 103 (1981), the Supreme Court stated:

> There is little to be added to the doctrine of res judicata as developed in the case law of this Court. A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.

It is clear that the law in *Mahaley* is binding upon the plaintiffs, the district court and our court and we have no right to change it. The panel made no determination of the issue of *res judicata.*

On page 574 of 661 F.2d it is stated: "*Mahaley* was a suit under the Housing Act of 1937, not the Fair Housing Act of 1968." This statement is incorrect as it was specifically stated by Judge Battisti that the suit was brought under "the Civil Rights Act of 1968, 42 U.S.C. Section 3601 *et seq.,* (Fair Housing Act), *Mahaley v. Cuyahoga Metropolitan Housing Authority, supra,* p. 1090. In his opinion, as a single judge, Battisti ruled that Parma and the other defendant cities discriminated against low income blacks and violated the Fair Housing Act. *Mahaley v. Cuyahoga Metropolitan Housing Authority,* 355 F.Supp. 1257, 1267, 1268. He tarred and feathered the entire population of these communities.

It was also incorrect for the panel to state that *Skillken* did not involve the Fair Housing Act as the opinion in that case expressly refers to Sections 3601 *et seq.* (Fair Housing Act). In *Skillken,* District Judge Young made intemperate remarks concerning the City Council and Plan Commission of Toledo as a "sad display of bigotry, intolerance and selfishness at its worst" which remarks we held were unsupported by the evidence and were clearly erroneous. We also held that federal courts were ill-fitted to operate municipal governments, which Judge Young in *Skillken* endeavored to do in following the procedures in school desegregation cases. In *Mahaley* we held that "the findings of discrimination are not supported by substantial evidence and are clearly erroneous." 500 F.2d 1091 (n.2). The unsubstantial evidence referred to included "remarks by officials in defendant Parma."

Judge Merritt, in his dissent in part, points out the flimsy evidence on which the panel majority relied to support its findings of liability stating:

> My problem with the opinion of the court is that it allows to stand the lower court's finding of liability based upon "the failure of the city council to adopt a resolution welcoming all persons of good will to Parma," and the City's "reputation among black residents of the Cleveland area of hostility to racial minorities." (opinion, p. 574) In order to remedy these wrongs, the District Court ordered the City to pass a welcoming resolution and adopt a comprehensive advertising program.

The opinion among black residents of Cleveland of Parma's reputation of hostility to racial minorities does not support the panel's majority finding of liability and it was error for the majority to so hold. This alone should justify reversal of the judgment. It is noteworthy that *Mahaley*, the plaintiff, was not even a resident of Parma, but lived in Cleveland. It would therefore appear that blacks living in Cleveland are endeavoring to change living conditions in Parma, which is a large separate municipality. There was no showing that Parma was in any way responsible for the concentration of black persons living in Cleveland.

There was not an iota of evidence offered that black persons were excluded from living in Parma. Many of them do live in Parma, although Parma is predominantly white. There is no evidence that the blacks and whites do not get along together in Parma. Federal courts, however, are not authorized to violate the constitutional rights of people of whatever race to association. *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). Parma cannot be held liable for racial concentration in Cleveland or for the racial attitudes of individuals, real estate operators and lenders.

It was error for the panel to invalidate duly enacted zoning ordinances of Parma which apply to all people white or black. The panel's invalidation of Parma's mandatory referendum ordinance relating to low cost public housing and holding that it constituted discrimination to enact it, conflicts with the decision of the Supreme Court in *James v. Valtierra*, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971), where the court on pages 142 and 143, 91 S.Ct. page 1334 stated:

The people of California have also decided by their own vote to require referendum approval of low-rent public housing projects. This procedure ensures that all the people of a community will have a voice in a decision which may lead to large expenditures of local governmental funds for increased public services and to lower tax revenues. It gives them a voice in decisions that will affect the future development of their own community. This procedure for democratic decisionmaking does not violate the constitutional command that no State shall deny to any person "the equal protection of the laws."

We relied on *James v. Valtierra, supra*, and quoted from it in *Mahaley*, p. 1092, but the panel has overturned *Mahaley* and obviously does not even agree with the Supreme Court.

It was wrong for the panel to invalidate legislation of a state legislative body for alleged racial motivation of the legislators or of the people of a community. We so held in *Ranjel v. City of Lansing*, 417 F.2d 321 (6th Cir. 1975), *cert. denied*, 397 U.S. 980, 90 S.Ct. 1105, 25 L.Ed.2d 390 (1970), *rehearing denied*, 397 U.S. 1059, 90 S.Ct. 1352, 25 L.Ed.2d 680 (1970). This is another instance of one panel ignoring the decision of another panel of this court.

The decision of the panel sets forth at length the decision of the district court on issues of liability and the huge comprehensive remedial order which undoubtedly will entail the expenditure by the taxpayers of Parma of millions of dollars. Noteworthy, is the extensive overbroad permanent injunction granted against the City and its officers and agents which is enforceable by contempt and reads as follows:

The general provision permanently enjoined the City, its officers, etc. from:

1. Engaging in any conduct having the purpose or effect of perpetuating or promoting racial residential segregation or of denying or abridging the right of any person to equal housing opportunity on account of race, color, religion, sex or national origin;

2. Discriminating against any person or group of persons on account of race, color, religion, sex or national origin in connection with the planning, development,

construction, acquisition, financing, operation or approval of any low-income or public housing units;

3. Interfering with any person in the exercise of his right to secure equal housing opportunity for himself or for others; and

4. Taking any action which in any way denies or makes unavailable housing to persons on the basis of race, color, religion, sex or national origin.

Pages 568 and 569.

It is obvious that this permanent injunction is unprecedented and constituted an improper interference by a federal court with the governmental affairs of the City and its officers and agents and would be fruitful of much supervision and litigation.

It should be pointed out that Parma has not met with much favor in our court. Even its right to appeal was questioned. Parma filed a notice of appeal from the extensive judgment holding that it violated the Fair Housing Act and which entered a comprehensive and excessive remedial order, including injunction which appeal an administrative panel erroneously dismissed as not constituting a final order because the judge had not yet appointed a special master (receiver). Parma moved for an en banc hearing on the dismissal of its appeal, which was denied. One judge dissented from the denial of Parma's right to appeal, as it conflicted not only with decisions of our court but also those of the Supreme Court. Parma's motion for a stay pending appeal was questioned by a panel erroneously stating that Parma had not applied to the district judge for its stay which was not true. The appeal was finally allowed after the district judge appointed a special master with extensive powers, such as a receiver.

The decision of the panel if permitted to stand will have far reaching consequences, as it permits even the motivation of state legislators and people of a community in enacting legislation to be questioned and the legislation invalidated by a federal court, if the motivation is alleged to be racial. I submit that if the motivation of state legislators or people may be questioned in the passage of state legislation, then the same rule should be extended to the motivation of congressman, which could be questioned by either federal or state courts. The federal government should never be permitted to specifically enforce compliance with federal legislation which operates to interfere with the lawful operation of state governments.

Chief Judge Battisti has been noted for issuing of extreme orders. In the Cleveland school desegregation case, in addition to appointing masters with powers of a receiver, he issued an order enjoining the. Supreme Court of Ohio from hearing a mandamus and prohibition case filed by two Cleveland banks against the Cleveland Board of Education to prevent the Cleveland Board from using funds levied to pay bonds for general operating expenses. A judge of this court issued a stay order and the Supreme Court of Ohio then heard and decided the case. *State ex rel. National City Bank v. Board*, 52 Ohio St.2d 81, 369 N.E.2d 1200 (1977). In *O'Neill, Chief Justice, et al. v. Battisti*, 472 F.2d 789, 791 (6th Cir. 1972), we had the spectacle of the Chief Justice and Associate Justices of the Supreme Court of Ohio having to file in our court a suit in mandamus and prohibition to vacate an injunction issued by Judge Battisti against the Chief Justice and all Justices of the Supreme Court of Ohio vacating part of the Supreme Court's orders and preventing the Supreme Court from hearing a disbarment proceeding pending in its court against a Cincinnati judge of the Court of Domestic Relations. We granted the writ holding that the injunction of Judge Battisti was not only improvidently granted, but also that he lacked jurisdiction over the Supreme Court Justices as the seat of the court was in the Southern District of Ohio, whereas Battisti sits in the Northern District of Ohio. The extreme actions taken by Judge Battisti in the present case and in other cases above mentioned do not oper-

ate to improve state and federal judicial relationships, which Chief Justice Burger sought in establishing State-Federal Judicial Councils.

The decision of the panel conflicts also with *Angell v. Manchester, et al.*, (D.C. Conn.No. 79–229) 1981, 9 Housing and Development Reporter 420; 50 Law Week 2267. See also article in *The National Law Journal*, November 9, 1981, entitled "Housing Bias Decisions Illustrate U. S. Paradox" appended hereto.

In sum, it is not the function of the federal government to desegregate the residential neighborhoods of the state's municipal governments or to operate state municipalities by the appointment of masters or receivers.

A grievous wrong has been inflicted upon the municipal government of Parma, a charter city, by the federal government which was a party to the *Mahaley* case, where the controlling issues raised in the present appeal were adjudicated against the federal government by our Court of Appeals, when we reversed Judge Battisti and certiorari was denied by the Supreme Court. In defending *Mahaley* and the present lawsuit, Parma has been subjected to large legal expenses and the present lawsuit should never have been brought by the federal government after it lost *Mahaley*. The conduct of the government appears to have been vindictive.

It is suggested that the present Attorney General's Office carefully review this case and if it concludes that the decision of the panel in the present appeal is erroneous, that it file in this court a confession of error so that the panel's erroneous decision may be expunged. This will save Parma the expense of taking this case to the Supreme Court and save the Supreme Court of the necessity of ruling upon and reversing the decision of the panel which is clearly wrong.

The decision of the panel is wrong. En banc consideration should have been granted.

APPENDIX

The Cincinnati Enquirer - February 1, 1981
Editorial

# THE JUDICIARY

## Parma falls victim to another excess by a federal court

BY ALMOST ANY measure, Parma, Ohio, is a long way from Buckeye, La. But by the reckoning of the federal courts, it is not very far at all. Federal Judge Frank J. Battisti has found Parma guilty of violating the 1968 Fair Housing Act by enacting laws "motivated by a racially discriminatory and exclusionary intent and [which] had forseeable segregative effects."

It seems that Parma enacted a law requiring a referendum to approve any low-income housing project. In addition, ordinances prohibited any building over 35 feet in height and required 2½ parking places for each dwelling. The judge decided these laws discriminated against blacks. He set aside the restrictive ordinances, announced that the city needs "approximately 2,669" low-income housing units and ordered them built at the rate of 133 units a year. In addition, he appointed a "special master" to see that his orders are carried out.

The "special master" has the power to look into municipal actions, to attend public and private meetings and to report to the judge on any delays in implementing his decision.

It is the kind of legal episode that reminds us of the situation in which three young girls — under the jurisdiction of a federal judge — are to be denied admission to a high school in Buckeye, La., and assigned to attend a school some 15 miles distant in order to satisfy that judge's desegregation order.

In the case of Parma, the power of the federal government is to be used not because there are no blacks residing in Parma — there are — but because local laws complicate the building of low-income and multi-family residences. And that, Judge Battisti finds, is discriminatory.

Parma's attorney in the matter calls the judge's decision a revolution. "The federal government has only the powers delegated to it by local government," he says. "But now the federal government has taken over a local government, so one of the disastrous consequences of this decision is that it turns our form of government on its head."

And so it does.

The federal courts, one by one, not only want to run the lives of individual public school students, they want to run the public schools and now the cities as well. These are tasks for which the judiciary is eminently ill-equipped.

That constitutes in our mind an abuse of federal authority and a usurpation of the power that is and ought to be resting in the hands of the people.

*Federal Policy Shift*

# Housing Bias Decisions Illustrate U.S. Paradox

BY LARRY TELL AND KAREN SCHNEIDER
Special to The National Law Journal:

THE JUSTICE Department last month was handed a victory it probably didn't welcome — and a loss it seemed comfortable with — in two separate cases involving alleged housing discrimination in nearly, all-white suburbs of Hartford, Conn., and Cleveland, Ohio.

The apparent paradox is a result of a shift in policy in the department's Civil Rights Division, now headed by Asst. Attorney General W. Bradford Reynolds, who has said he does not think the department should be filing the kind of far-reaching housing discrimination cases involved, both of which were undertaken before the

Reagan administration came into office.

The federal government "is not in the business of telling localities what to build and where to build it," Mr. Reynolds has said.

The Oct. 14 Hartford decision, clearing Manchester, Conn., of charges of discriminating against minorities in its local housing policies, marked the first time that the Justice Department, one of the plaintiffs in the class action, has lost a housing discrimination case brought against a

*Continued on page 14*

RULING UPHELD: U.S. District Judge Frank J. Battisti's ruling that a Cleveland suburb had deliberately excluded minorities was upheld by the 6th U.S. Circuit Court of Appeals.

# Ohio, Conn. Decisions Show Bias Policy Shift

*Continued from page 3*

municipality under the Fair Housing Act of 1968.

U.S. District Judge M. Joseph Blumenfeld ruled that Manchester voters weren't racially motivated when they decided, in a 1979 referendum, to withdraw from a federal grant program that required the town to promote integration and housing for the poor. (NLJ, May 18.)

In his ruling, Judge Blumenfeld said the citizens' revolt against the program violated neither the Fair Housing Act nor constitutional guarantees of equal protection. *Angell v. Zinsser*, 79-229.

"Although it is clear to the court that there was present . . . some un-

dercurrent of fear of a mass influx of poor blacks into Manchester, the court cannot find that this was a dominant factor or even that it was a factor in the votes of a majority of those voting in favor of the referendum," Judge Blumenfeld said in his 117-page decision.

True to Mr. Reynolds' policy stance, Justice Department officials have said they will oppose an appeal of the ruling. However, the department may get a chance to argue its new views in an appeal of the other housing case decided the same day.

In that case, the 6th U.S. Circuit Court of Appeals rejected Parma, Ohio's scatter-shot challenge to a 1980 ruling by U.S. District Judge Frank J.

Battisti of Cleveland, who had found that the city deliberately excluded minorities in violation of the Fair Housing Act. *U.S. v. City of Parma*, 494 F. Supp. 1049.

The circuit court ruling upheld much of Judge Battisti's sweeping remedial order, which enjoined Parma from further housing discrimination, created a fair housing committee within the city government and required the city to seek more subsidized housing for low- and moderate-income families. The court, however, rejected Judge Battisti's appointment of a special master to oversee implementation of the order — an approach hailed at the time as forging an important new tool against housing discrimination. (NLJ, 11-3-80.)

According to City Solicitor Andrew Boyko, Parma plans to seek U.S. Supreme Court review of the case, which could give the Justice Department an opportunity to translate Mr. Reynolds' theory into a Supreme Court brief.